C.B.S. IMPORTS CORP.

v.

UNITED STATES.

C.D. 4739;  Court No. 73-1-00020.

United States Customs Court.

April 4, 1978.

Siegel, Mandell & Davidson, New York City (Brian S. Goldstein, New York City, of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Bernard J. Babb, Washington, D. C., Trial Atty., for defendant.

RE, Chief Judge:

In this customs reappraisement case, the question presented pertains to the correct dutiable value of imported merchandise. The merchandise consists of men's sport shirts which were sold to plaintiff by The Tosho Co., Ltd., Osaka, Japan pursuant to purchase orders made between May and July 1971. It was exported from Japan on December 12, 1971.

The appraisement was made on the basis of export value, which is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(b)), as follows:

"(b) For the purposes of this section, the export value of imported merchandise *shall be the price, at the time of exportation* to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States." (Emphasis added.)

The appraising officer arrived at the appraised value by accepting the invoice unit values stated in U.S. dollars, as entered, and adding thereto a charge of 7.2 percent. This 7.2 percent was added to reflect the upward revaluation of the Japanese yen occurring between the dates of orders (May and July 1971), and the date of exportation (December 1971). It was added in accordance with instructions set forth in Bureau of Customs (now the Customs Service), Region II, Information Bulletin No. 162, dated January 3, 1972, entitled "Appraisement— Currency Parities."

The parties do not dispute the invoice unit prices, and only the addition of the 7.2 percent is in issue. The question presented, one of first impression, is whether this addition, representing the difference in the yen/dollar exchange rate between the dates of the orders and the date of exportation, is includable as part of the export value basis of appraisement.

A brief sketch of the international system of currency exchange rates during the period in question may be helpful in understanding the legal question presented.

By the "Bretton Woods Agreement" in 1945, each member of the International Monetary Fund, which includes the United States, agreed to a fixed rate of exchange of its currency.

Throughout the 1960's, because of the Vietnam War, changes in the world economy, and other causes, the United States balance of payments position deteriorated drastically. Furthermore, liquid capital flows were moving heavily against the United States. Speculative factors contributed to this situation as investors anticipated exchange rate appreciations by some of the countries which were heavy recipients of United States funds, such as Japan.

As a remedial measure, on August 15, 1971 President Nixon announced that the United States would temporarily suspend the convertibility of the dollar into gold or other reserve assets, and imposed a 10 percent surcharge on all imports. Pres. Proc. 4074, 3 C.F.R. 60 (1971–1975 Comp.).

The Secretary of the Treasury announced that the United States would not attempt to maintain official currency parities by buying or selling foreign currencies in the exchange markets. N. Y. Times, August 17, 1971, at 16.

Subsequently, a number of countries, Japan among them, allowed their currencies to "float" against the dollar. This situation continued until December 18, 1971 when the so-called "Smithsonian Agreement" again fixed the parity of various currencies. The dollar was thereby devalued against the yen by almost 17 percent from the April 1971 rates.

In response to these changes in currency parities, the Bureau of Customs issued instructions to increase appraised values correspondingly. These instructions are embodied in Bureau of Customs, Region II, Information Bulletin No. 162, dated January 3, 1972.[1]

Plaintiff contests the appraisement, and claims that the 7.2 percent addition is not properly part of dutiable value since it is not made in accordance with the statutory definition of export value. It is plaintiff's contention that statutory valuation is not concerned with the net amount of foreign currency ultimately received by the foreign exporter, but only the price paid by the American importer. As there is no proof of sales of "such or similar merchandise" at a price higher than that paid by plaintiff, plaintiff maintains that defendant improperly computed export value. Specifically, plaintiff contends that it is error to compute export value by estimating the dutiable value taking into account any currency fluctuation between the dates of orders and the date of exportation without any basis in actual market conditions.

Defendant argues that the appraisement, although expressed in terms of unit invoice values plus 7.2 percent represents the price that the customs officer found to be the freely offered price at which such or similar merchandise was freely sold or offered for sale to all purchasers for export to the United States. The appraising customs official is directed by statute (19 U.S.C. § 1500(a)) to ascertain or estimate the value of the entered merchandise by all reasonable "ways and means" in his power. The defendant therefore contends that, notwithstanding any statement of cost in any invoice, the method of determining value directed by the Regional Commissioner of Customs in Information Bulletin No. 162 is clearly reasonable in light of the declining value of the dollar vis-à-vis the yen between the dates of orders and the date of exportation. Relying on the statutory presumption of the correctness of the customs official's determination (28 U.S.C.

---

1. For a discussion of the currency exchange system and its changes during the period in issue, see Edwards, *The Currency Exchange Rate Provisions of the Proposed Amended Articles of Agreement of the International Monetary Fund*, 70 Am. J. Int'l L. 722, 723–26 (1976); S. Rep. No. 92–678, 92d Cong., 2d Sess., reprinted in [1972] U.S. Code Cong. & Admin. News p. 2209.

§ 2635(a)), defendant urges that the appraisement should be upheld as plaintiff has failed to overcome this presumption.

At the trial, plaintiff introduced three exhibits into evidence: the deposition of Mr. Vincent J. DeMaio, the import specialist who appraised the merchandise, together with four deposition exhibits including Information Bulletin No. 162; the affidavit of Mr. Ryozo Tsugeno, manager of the Textile Made-Up Goods Department of The Tosho Co., Ltd., Osaka, Japan; and Bureau of Customs, Region II, Informational Pipeline No. 21, Supplement No. 1, which provided the tables for computing the amount of the dollar/yen fluctuation during the pertinent period.

The defendant introduced the testimony of its expert witness, Dr. Joseph Brada, associate professor of economics and international business at the Graduate School of Business Administration, New York University.

In his deposition, Mr. DeMaio testified that he passed on the invoices in question, and that to his knowledge his advisory appraisement had been approved by the "appraiser." He stated that the 7.2 percent addition to the invoice values represented the difference in the yen/dollar exchange rate as of the date of the purchase order or contract as compared to the date of exportation. In determining the addition of 7.2 percent, Mr. DeMaio explained that he converted the U.S. dollar value of the merchandise into yen at the rate that prevailed on the date of the contract, and reconverted into U.S. dollars at the rate that prevailed on the date of exportation. Mr. DeMaio stated that the entry was appraised in accordance with the instructions set forth in Information Bulletin No. 162.

Information Bulletin No. 162, addressed to customs employees, customs brokers and others, was in the form of a telegram received from the Bureau of Customs. The Bulletin which was for "information and guidance," provided in pertinent part that:

"Starting immediately, whenever the District Director is satisfied that the invoice price in dollars represents export value at the time of the contract, he shall appraise the imported merchandise in the following manner:

1. He shall convert the dollar value of the merchandise into the foreign currency at the rate which prevailed on the date of the contract, and he shall reconvert into dollars at the rate which prevailed on the date of exportation."

Region II, Informational Pipeline No. 21, Supplement No. 1, contains the rates of exchange on the dates of the purchase orders or contracts (.00279733 and .00279800) and the date of exportation (.00299950). The currency factor charts set forth therein provide the factor by which the invoice price in dollars is to be multiplied to determine the increased "value." For the dates in issue in this litigation, the factor is 1.072, which can also be expressed as 7.2 percent.

█ It is clear that the imported merchandise was appraised in accordance with Information Bulletin No. 162. It is equally clear that the administrative bulletin is not binding on the court. Administrative regulations and directives should be upheld if found to implement the will of Congress as expressed in the statute. As stated by Mr. Justice White in *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973): "that principle is to set the framework for judicial analysis; it does not displace it." *See Commissioner of Internal Revenue v. South Texas Lumber Co.,* 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948); *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

It is the function of this court on judicial review to interpret and apply the tariff laws in light of the intent of Congress. In the performance of this function, the court cannot defer to an administrative interpretation or application of a statute if it is inconsistent with the statutory language or congressional intent. *See Social Security Board v. Nierotko,* 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946); K. C. Davis, *Administrative Law of the Seventies* § 5.03, at 147 (1976). *See also C. J. Tower & Sons v.*

728

*United States,* 33 Cust.Ct. 14, 17, C.D.1628 (1954) and authorities cited in *Suwannee Steamship Co. v. United States,* 79 Cust.Ct. ——, C.D. 4708, 435 F.Supp. 389 (1977).

■ The fundamental principle of supremacy of law, the crux of our constitutional government, requires that all public officials obey the mandates of the Constitution and the lawful enactments of the Congress. *See* U.S.Const. art. VI; *United States v. Lee,* 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882).[2] In cases of delegated power, an application of the principle is illustrated by the Supreme Court case of *Morrill v. Jones,* 106 U.S. 466, 1 S.Ct. 423, 27 L.Ed. 267 (1883) which dealt with a revenue law which provided that " '[a]nimals, alive, specially imported for breeding purposes from beyond the seas, shall be admitted free [of duty] upon proof thereof satisfactory to the secretary of the treasury, and under such regulations as he may prescribe.' " By regulation the Secretary prescribed that before a collector of the port admitted animals imported for breeding purposes free of duty he had to "be satisfied that the animals [were] of superior stock, adapted to improving the breed in the United States." The importer claimed that certain animals should have been admitted duty free because they had been "specially imported for breeding purposes." Although it was admitted that the animals were imported for breeding purposes, the collector demanded payment of duties on the ground that he was not satisfied that the animals were of "superior stock." In affirming the judgment returning to the importer the duties paid under protest, Chief Justice Waite wrote:

"The Secretary of the Treasury cannot by his regulations alter or amend a revenue law. All he can do is to regulate the

mode of proceeding to carry into effect what Congress has enacted. In the present case we are entirely satisfied the regulation acted upon by the collector was in excess of the power of the secretary." 106 U.S. at 467, 1 S.Ct. at 424.

■ The *Morrill* case illustrates that an administrative official must execute or fulfill the expressed statutory mandate. He may not, by regulation or directive, amend or modify a statute by "[putting] into the body of the statute a limitation which congress did not think it necessary to prescribe." In the words of Chief Justice Waite, "the object of the secretary could only be accomplished by an amendment of the law." *See also* statements of Mr. Justice Holmes in *Waite v. Macy,* 246 U.S. 606, 608–09, 38 S.Ct. 395, 62 L.Ed. 892 (1918).

Whether pursuant to regulations, bulletins or other directives, it is the judicial function to determine whether the administrative official has acted *ultra vires,* i. e., beyond the power delegated in the enabling act. *See Columbia Broadcasting System v. United States,* 316 U.S. 407, 422, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). *See also Picone v. Commissioner of Licenses of New York City,* 241 N.Y. 157, 162, 149 N.E. 336, 338 (1925) in which Judge Pound of the New York Court of Appeals stated that, "[l]aws are made by the law-making power, and not by administrative officers acting solely on their own ideas of sound public policy, however excellent such ideas may be."

In the present case the question presented is whether the imported merchandise was correctly appraised within the meaning of "export value" as set forth in section 402(b) of the Tariff Act of 1930, as amended. Although the cases cited by counsel in their briefs may shed some light upon the

2. In the *Lee* case, the son of General Robert E. Lee sued successfully for the recovery of property of the Lee family against the commandant of Fort Myer and the superintendent of the national cemetery at Arlington. Mr. Justice Miller proclaimed the principle of supremacy of law in the following imperishable language: "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the

officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government . . . . Courts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government . . . ." 106 U.S. at 220, 1 S.Ct. at 261.

question presented, none is dispositive of the specific issue before the court.

■ The statutory language speaks with crystal clarity that "the export value of imported merchandise shall be the *price,* at the time of exportation to the United States." (Emphasis added.) Congress intended that "export value" be based on actual prices, as determined by sales or offers for sale, rather than on any abstract notion of "value." Export value was originally defined as the "market value or price" of the merchandise. Tariff Act of 1930, ch. 497, Title IV, § 402(d), 46 Stat. 709 (1930). When Congress amended the definition of "export value," it eliminated "market value" as an element of "export value." Customs Simplification Act of 1956, ch. 887, § 2(a), 70 Stat. 943 (1956). Now, under the controlling statute, export value is based exclusively on the *price* of the merchandise. 19 U.S.C. § 1401a(b).

■ It cannot be doubted, therefore, that an increase in *price* between the dates of orders or contracts, and the date of exportation will result in an appraised value at the higher price prevailing on the date of exportation. *White Lamb Finlay, Inc. v. United States,* 29 CCPA 199, C.A.D. 192 (1942); *Blumenthal & Co. v. United States,* 12 Ct.Cust.App. 176, T.D. 40166 (1924); *Sam Yeung Co. v. United States,* 52 Cust.Ct. 572, R.D. 10760 (1964). In each of these cases, however, there was sufficient proof of the increased price through actual sales on the date of exportation, or increases in the price list at the date of exportation. In the present case there is no evidence of sales or offers for sale of such or similar merchandise at a price higher than that paid by plaintiff. To the contrary, the affidavit of Mr. Ryozo Tsugeno states categorically that the merchandise was neither sold nor offered for sale for exportation to the United States at prices higher than those paid by plaintiff during the period May 19, 1971 through December 12, 1971. Mr. Tsugeno also stated that, based upon his personal inspection of the books and records kept in the ordinary course of business, plaintiff paid no additional sums to Tosho Co., Ltd.

for the merchandise "by reason of revaluation of currency or for any other reason."

Information Bulletin No. 162 predicates the increase in value for appraisement purposes solely on the changes in currency parities. It directs that "[the District Court of Customs] shall require the deposit of estimated duties which fully reflect the increase in value which the currency fluctuations would normally cause to occur."

Defendant's expert witness, Dr. Joseph Brada, on direct examination was asked whether the prices for merchandise ordered in the period May-July 1971 from a Japanese exporter, and invoiced in U.S. dollars, would be higher than merchandise sold in December of 1971, the date of exportation. In response, he stated that:

"The price would be higher in order to get the same purchasing power . . . The presumption one makes in international trade is that the . . . exporter . . . is ultimately interested in how much he's getting in terms of domestic currency because his payments to his workers, to his suppliers, and to his creditors have to be made in the domestic currency . . . . It would have taken more dollars to buy the same number of yen that the exporter had to pay to the workers and everybody else, so I would say yes, it would take more dollars."

Under the statutory formula or definition, however, the amount received by the foreign exporter for his goods in terms of his own domestic currency is not the controlling factor. The statute does not provide for the assessment of duty in this manner. The statute speaks of "price" and, in the language of this court in *Ernesto Solari et al. v. United States,* 5 Cust.Ct. 449, 456, R.D. 4943 (1940): "the law makes offers [for sale] the criterion in determining value. Congress did not consider any sums that a foreign exporter received for his goods as having any bearing on the lawful entered value of imported merchandise." *See United States v. Fisher Scientific Co.,* 26 CCPA 278, C.A.D. 27 (1938).

In the *Ernesto Solari* case, the Italian government forbade exports from the United States to be imported to Italy until an equal value of Italian exports had been sold to the United States. Italian exporters were selling the dollars received from American importers to Italian importers desirous of importing American goods at a premium above the usual exchange rate. The court held that such additional sums were not to be considered part of dutiable value. This result was justified because the class of goods imported into the United States was available to all American importers at the same price, even if that price was lower than before the Italian government's restriction on imports from the United States. What the Italians did with the dollars once they received them was irrelevant in determining proper dutiable value.

It is true that Tosho Co., Ltd. received fewer yen for the same number of dollars on the date of exportation than it would have received had the currency exchange occurred on the dates of the purchase orders. But the change in the currency exchange rates does not automatically mean a corresponding rise in prices. Defendant's own witness, Dr. Brada, testified on cross-examination that many economic factors other than currency fluctuations could affect the price of merchandise such as that in issue here. These factors might include the level of prices in the two countries, general economic conditions, conditions in the particular industry, competition, and the nature of the merchandise itself, such as whether it was seasonal.

The Bulletin presumes that currency fluctuations or revaluations automatically increase prices, and places the burden upon the importer to show that the value of the merchandise did not rise correspondingly with the increase in value of the foreign currency. Presumably, some or all of the various factors listed by Dr. Brada could be used by the importer to show that there was no actual rise in value of its merchandise. But, it is precisely these factors that must be taken into consideration by the customs officials in determining export value.

It is clear that the defendant has only performed a mathematical computation on the invoice unit values of the merchandise to determine export value. Mr. Tsugeno in his affidavit states:

"Based upon my knowledge of the instant merchandise and that offered by other manufacturers in Japan for exportation to the United States, I can personally state that no commercially interchangeable merchandise with that involved herein was sold or offered for sale for exportation to the United States during the pertinent period in question;

\* \* \* \* \* \*

During the period between May 19, 1971 and December 12, 1971 there were no intervening sales or offers for sale for this merchandise by reason of the fact that the merchandise in question is seasonal in nature."

The appraising officer, of course, is not limited to the information contained in the invoices, but may use all reasonable ways and means in ascertaining or estimating value. 19 U.S.C. § 1500; *Concord Electronics Corp. v. United States,* 69 Cust.Ct. 241, 244, A.R.D. 304, 345 F.Supp. 1000, *appeal dismissed,* 60 CCPA 185 (1972). The estimation, however, must be based on the pertinent facts available at the time. The defendant's determination of value appears to be based more on theory than on actual facts having evidentiary value. A mathematical computation is not evidence of sales or offers for sale in the country of exportation. Under the statutory language, export value cannot be ascertained or estimated in this manner. *See United States v. Alatary Mica Co.,* 19 CCPA 30, 34, T.D. 44871 (1931).

Apparently believing that it is supportive of its position, the defendant cites *Calif-Asia Co. v. United States,* 17 Cust.Ct. 461, R.D. 6582 (1946) as "a situation where the Court sanctioned the use of currency revaluation in determining the freely offered price at the time of exportation." That case was decided on its particular facts, and can have but little precedential value. It

may be noted, however, that it was decided pursuant to a customs regulation that required currency conversion for the purpose of comparing values in determining the proper statutory value. The *Calif-Asia* case did not "sanction" the addition of a percentage to invoice unit values solely to represent the difference in currency exchange rates between the date of order and the date of exportation.

■ The statute requires that export value be determined by the *price* at which such or similar merchandise is *sold, or in the absence of sales, offered for sale* for exportation to the United States. Defendant's method of appraisement was not permitted by the explicit language of the statute. It is, therefore, the determination of the court that the 7.2 percent addition to invoice unit values is not properly part of export value.

■ In customs litigation, however, it is firmly settled that the plaintiff must not only prove that the appraised value is erroneous, but also establish a different value in its place. *Arditi v. United States,* 50 CCPA 49, C.A.D. 818 (1963); *Kittleson v. United States,* 40 CCPA 85, C.A.D. 502 (1952).

■ To establish a value different from the appraised value, plaintiff relies on the judicially established doctrine of separability. Under this doctrine, a party to a reappraisement decision may challenge one or more of the elements entering into an appraisement while relying upon the presumption of correctness of the appraiser's return as to all other elements. *United States v. H. M. Young Associates,* C.A.D. 1138, 505 F.2d 721, 62 CCPA 20 (1974); *United States v. Fritzsche Bros.,* 35 CCPA 60, C.A.D. 371 (1947); *Haddad & Sons v. United States,* 54 Cust.Ct. 600, R.D. 10942 (1965), *aff'd,* 56 Cust.Ct. 792, A.R.D. 205 (1966); *United States v. Dan Brechner et al.,* 38 Cust.Ct. 719, A.R.D. 71 (1957). Thus, by relying on the separability doctrine, a plaintiff avoids the burden of proving each and every element of the claimed values when those elements are not contested. To take advantage of separability, the appraisement must be at the invoiced "first cost" or *per se*

price, plus various charges, and not at a unitary price in which the appraisement is expressed as a single indivisible unit. *See Concord Electronics Corp. v. United States,* 69 Cust.Ct. 241, A.R.D. 304, 345 F.Supp. 1000, *appeal dismissed,* 60 CCPA 185 (1972), and cases cited therein.

Defendant claims the appraisement at issue is not separable as it expresses the price found by the Regional Commissioner to represent the freely·offered prices at the time of exportation, and not a mere addition to invoice values for some charge that he believed to be included in the price of the merchandise.

Additions to invoice prices to reflect claimed increases in value, however, have been held to be separable charges. For example, in *United States v. Fritzsche Bros.,* 35 CCPA 60, C.A.D. 371 (1947) the Court of Customs and Patent Appeals held as a separable charge the addition of 8.4 percent to the invoice values to reflect a claimed increase in the per ounce value of the merchandise due to evaporation or shrinkage in transit.

■ Application of the separability doctrine is appropriate not only on the authority of the *Fritzsche Bros.* case, but also on the basis of the purpose of the doctrine. It is the essence of the doctrine that in a reappraisement case, the plaintiff who has the burden of establishing each and every disputed element of value need not prove that which is not in issue. It was formulated to reduce trial time, and limit effort to those issues actually in dispute. As stated by the Court of Customs and Patent Appeals in *United States v. H. M. Young Associates,* 62 CCPA 20, 23, C.A.D. 1138 (1974): "Absent the separability rule, the courts, the government, and importers would all undergo an anomalous process in which plaintiff would undertake to prove the correctness of unchallenged actions of defendant, while defendant, presumably, would abandon the presumption of correctness and attempt to prove its own unchallenged actions incorrect." This procedure, the court observed, would be "manifestly unfair, not only to the importer, but also to the courts

and to the society, which must be taxed to pay for a portion of every litigious process in which the government participates." *See also United States v. Gehrig, Hoban & Co.,* 56 Cust.Ct. 782, A.R.D. 204 (1966), *aff'd,* 54 CCPA 129, C.A.D. 924 (1967).

The question before the court pertains to dutiable value. Clearly, therefore, the only issue to be resolved is the correctness of the addition of 7.2 percent to the invoice prices, representing currency fluctuations between the dates of orders or contracts and the date of exportation. To require the plaintiff to prove all the elements of export value, which are not in dispute, would be unfair to plaintiff, and wasteful of time and effort.

Defendant claims that even if the appraisements are separable, as they have been found to be, plaintiff still cannot prevail. Relying on *United States v. Pan American Import Corp.,* C.A.D. 993, 428 F.2d 848, 57 CCPA 134 (1970), defendant contends that in order to rely on the presumption that the unchallenged portion of the appraisement represents the export value, plaintiff must show that the merchandise was freely sold or offered for sale on the same basis as sold to it. The requirement in *Pan American* that plaintiff show the merchandise was freely sold or offered for sale before it could rely on the presumption of correctness of the government's appraisement has recently been expressly overruled by the Court of Customs and Patent Appeals in *United States v. Imperial Products, Inc.,* C.A.D. 1203, 570 F.2d 337, 65 CCPA —— (1978):

> "[W]e conclude that *Pan American* was wrongly decided, and now expressly overrule it. A viable *Pan American* would reduce the presumption of the appraiser's valuation to the correctness of the money figure itself and would require an importer to prove the elements of 19 USC 1401a(b) though he challenges only a single added-on item." C.A.D. 1203, slip opinion at 11, 570 F.2d at 341.

The court held that the separability doctrine operates to relieve the plaintiff from any requirement to prove undisputed elements of export value.

In the present case, the 7.2 percent addition, a single added-on item, is the only item being challenged. The correctness of this additional item does not depend upon the plaintiff showing any of the elements of export value. Plaintiff, therefore, may rely on the correctness of the undisputed portions of the appraisement through the operation of the separability doctrine.

The only dispute before this court relates to the 7.2 percent addition to the invoice prices. The appraiser clearly considered the *per se* price of the merchandise to be the invoice unit values, and, in accordance with Bulletin No. 162, made the 7.2 percent addition to reflect the assumption that the merchandise increased in value in proportion to the decrease of the dollar vis-à-vis the yen. This addition is not permitted by the language of the statute. The statute requires that export value be determined by the price at which such or similar merchandise is offered for sale or sold for exportation to the United States. The appraisement of the merchandise in issue is therefore erroneous. Through the operation of the separability doctrine, the plaintiff has fully met its burden of establishing a different value for the merchandise.

In view of the foregoing, and on the record before it, the court makes the following findings of fact and conclusions of law:

*Findings of fact:*

1. The merchandise consists of men's sport shirts exported from Japan by The Tosho Co., Ltd., Osaka, on December 12, 1971.

2. The merchandise was sold to C.B.S. Imports by The Tosho Co., Ltd. on May 19, 1971, July 15, 1971 and July 22, 1971.

3. The merchandise does not appear on the final list of the Secretary of the Treasury, T.D. 54521.

4. The merchandise was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

5. Plaintiff accepts export value, the basis of appraisement, as correct, but disputes the addition of 7.2 percent to the invoice unit values representing differences in the yen/dollar exchange rate between the dates of orders and the date of exportation.

*Conclusions of Law:*

1. That export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for appraisement of this merchandise.

2. That under the separability doctrine, plaintiff's burden of proof is limited to showing that the 7.2 percent addition is not includable in export value.

3. That the addition of 7.2 percent for currency fluctuation is not includable in export value.

4. That the presumption of correctness attaching to the customs officer's determination of value for the merchandise in question has been overcome.

5. That the invoice unit values are the export values of the merchandise.

Judgment will issue accordingly.