**MELAMINE CHEMICALS, INC., Appellee,**

v.

**The UNITED STATES, Appellant.**

**Appeal No. 83–1364.**

United States Court of Appeals, Federal Circuit.

April 19, 1984.

Francis J. Sailer, Washington, D.C., argued for appellant. With him on the brief were J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director, Washington, D.C. and Velta A. Melnbrencis, Asst. Director, New York City.

Bruce E. Clubb, Washington, D.C., argued for appellee. With him on the brief were B. Thomas Peele and Arthur L. George, Washington, D.C.

Before MARKEY, Chief Judge, COWEN, Senior Circuit Judge, and BALDWIN, Circuit Judge.

MARKEY, Chief Judge.

Appeal from the order of the United States Court of International Trade (CIT) rescinding an Amended Final Negative Determination of the Department of Commerce (Commerce), and from a judgment holding unlawful the Commerce's use of the preceding quarter's exchange rate in the fair value investigative phase of a particular anti-dumping proceeding. We *vacate* and *reverse*.

## Background

On February 23, 1979, Melamine Chemicals, Inc. (Melamine) filed a complaint with the Department of the Treasury (Treasury) alleging sales at Less Than Fair Value (LTFV) of melamine from the Netherlands. Treasury initiated antidumping investigations on May 1, 1979, and published a Tentative Negative Determination (that there had been no sales at LTFV) on November 13, 1979. (44 Fed.Reg. 65517).

On January 2, 1980, Commerce's International Trade Administration Division (ITA), having assumed Treasury's responsibility for LTFV determinations, announced (45 Fed.Reg. 12466) that it found error in Treasury's computations and that there was a dumping margin (LTFV). ITA changed Treasury's Determination to an Affirmative Preliminary Determination.

After a hearing and reception of briefs, Commerce issued an Affirmative Final Determination (45 Fed.Reg. 20152) effective March 27, 1980. On reconsideration and after a hearing and reception of additional briefs, Commerce amended its original findings and published an Amended Final Negative Determination on May 5, 1980, occasioning this litigation.

Pursuant to 19 U.S.C. § 1673d(c)(2), Commerce terminated the investigation in view of its negative determination. (45 Fed. Reg. 26918.)

Melamine's challenge to the Amended Final Negative Determination, filed in the CIT pursuant to 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c), raised a number of issues.[1] On appeal, Melamine maintains that

---

1. Melamine raised due process issues (improper ex parte contacts and inadequate notice), and

Commerce may not in conducting a fair value investigation lawfully use exchange rates from the quarter preceding the period (November 1, 1978—April 30, 1979) being investigated, because a statute, 31 U.S.C. § 372 (now codified at 31 U.S.C. § 5151; cited here as § 372),[2] requires use of the exchange rate prevailing for the quarter in which the merchandise was exported.

### Proceedings in the CIT

Upon cross-motions for summary judgment, the CIT held that Commerce acted unlawfully in applying the preceding quarter's exchange rate. *Melamine Chemicals, Inc. v. United States,* 561 F.Supp. 458 (Ct. Int'l Trade 1983).

In its opinion dated August 25, 1983, the CIT stated:

"19 C.F.R. § 353.56 [3] mandate[s] ... conversion of foreign currency ... to determine the difference between United States price and fair value or foreign market value *shall* be made in accord-

ance with the provisions of 31 U.S.C. § 372" *Id.* at 462. (emphasis in the original)

\* \* \* \* \* \*

"19 C.F.R. § 353.56(a) specifically mentions both *fair value* and *foreign market value* as being *subject to 31 U.S.C. § 372.* ... By defendant's [United States'] own admissions an antidumping order is not imposed at the fair value stage of the investigation. Therefore, it would be impossible to have an assessment and collection of duties at that juncture. If *defendant's contention* were upheld it would render *certain language referring* to fair value in *19 C.F.R. § 353.56(a) meaningless.* It is evident that a fair value proceeding and investigation is subject to the conversion rules of 31 U.S.C. § 372." *Id.* (emphasis added).

\* \* \* \* \* \*

challenged Commerce's authority to amend a Final Determination. Those issues were not reached by the CIT and are not before us.

2. 31 U.S.C. § 372 provides in pertinent part:
*Conversion of currency*
(b) Proclaimed value basis of conversion
For the purpose of the assessment and collection of duties upon merchandise imported into the United States on or after June 17, 1930, wherever it is necessary to convert foreign currency into currency of the United States, such conversion, except as provided in subsection (c) of this section, shall be made at the values proclaimed by the Secretary of the Treasury under the provisions of subsection (a) of this section, for the quarter in which the merchandise was exported.
(c) Market rate when no proclamation
(1) If no value has been proclaimed under subsection (a) of this section for the quarter in which the merchandise was exported, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate at noon on the day of exportation, then conversion of the foreign currency involved shall be made—
(A) at a value measured by such buying rate, or
(B) if the Secretary of the Treasury shall by regulation so prescribe with respect to the particular foreign currency, at a value measured by the buying rate first certified under this subsection for a day in the quarter in which the day of

exportation falls (but only if the buying rate at noon on the day of exportation does not vary by 5 per centum or more from such first-certified buying rate).
(2) [definition of "buying rate" and various methods for its calculation].

3. 19 CFR § 353.56 provides:
(a) Rule for conversion. In determining the existence and amount of any difference between the United States price and the fair value or foreign market value for the purposes of this part or of the Act, any necessary conversion of a foreign currency into its equivalent in United States currency shall be made in accordance with the provisions of section 522 of the Tariff Act of 1930, as amended (31 U.S.C. 372):
(1) As of the date of purchase or agreement to purchase, if the purchase price is an element of the comparison; or
(2) As of the date of exportation, if the exporter's sales price is an element of the comparison.
(b) *Special rules for fair value investigations.* For purposes of fair value investigations, manufacturers, exporters, and importers concerned will be expected to act within a reasonable period of time to take into account price differences resulting from sustained changes in prevailing exchange rates. Where prices under consideration are affected by temporary exchange rate fluctuations, no differences between the prices being compared resulting solely from such exchange rate fluctuations will be taken into account in fair value investigations.

"[W]hat defendant [United States] does not demonstrate is the *statutory authority* for the enactment of 19 C.F.R. § 353.56(b) and the authority for using a '90 day lag rule'.... The provisions relating to the imposition of antidumping duties were intended to streamline the domestic procedures relating to antidumping actions. Thus, a regulation such as 19 C.F.R. § 353.56(b) promulgated in the spirit of improving administration of the antidumping law by expediting its investigative phase and improving over-all efficiency is well within the intent of the legislature". *Id.* at 463 (emphasis added).

\* \* \* \* \* \*

"It is axiomatic that where there is a conflict between a statute enacted by the legislature and a rule or administrative regulation promulgated by an administrative agency in accordance with the statute, the statute must prevail." *Id.*

\* \* \* \* \* \*

"In the present case there is a specific statute, 31 U.S.C. § 372, that authorizes the methodology for currency conversion.... The Customs regulation in issue was promulgated pursuant to the Trade Agreements Act of 1979. *On the surface it is harmonious with the legislative enactment.* However, Customs' application (the 90 days lag rule) of the statute is *hardly in keeping with the legislative intent.* In viewing the entire picture one realizes that it is not a mere ninety (90) days for currency fluctuation purposes. By using the currency rate of the preceding quarter for conversion purposes, Commerce is actually permitting the foreign exporter 180 days to rectify its pricing practices to insure that it does not sell at LTFV". *Id.* at 464. (emphasis added).

Thus the CIT described 19 CFR § 353.56(b) as in conflict with 31 U.S.C. § 372 and

unsupported by statutory authority, while at the same time describing that regulation as "well within the intent of the legislature," designed for "improving administration of the antidumping law by expediting its investigative phase and improving over-all efficiency", *Id.* at 463, and on the surface "harmonious with the legislative enactment". *Id.* at 464.

The court went on to find Customs' application of "the statute" not "in keeping with the legislative intent", *Id.* and concluded that "Commerce's arbitrary *application* of the preceding quarter's conversion rate is outside the scope of the enabling statute [31 U.S.C. § 372]." *Id.* (emphasis added).

In the court's view, an earlier-proposed 45-day lag, though "the legislature specifically permitted" it, would not be a proper basis for believing that Congress would accept a 90-day lag rule as falling within the "reasonable period of time" language of the regulation involved here (19 CFR § 353.56(b)). *Id.* at n. 11.

Thus, whatever may have been the view of the CIT respecting the validity of § 353.56(b) itself, its decision can be said to have rested on its conclusion that Commerce had no authority to apply the preceding quarter's exchange rate in conducting a fair value investigation.

The CIT ordered recision of Commerce's Final Negative Determination, remanded the action to Commerce to determine "whether the Netherlands sold melamine at LTFV between November 1, 1978 and March 31, 1979", and directed the Secretary of Commerce to report his redetermination to the CIT within 120 days.

Upon counsel's stipulation, the CIT, also on August 25, 1983, suspended liquidation of Melamine entries from the Netherlands after September 5, 1983, and stayed, pending this appeal, orders it had issued on March 25, 1983 and August 16, 1983.[4]

---

**4.** The March 25, 1983 order granted Melamine's motion for review to the extent of remanding to Commerce for a redetermination report on whether melamine was sold at LTFV between November 1, 1978 and March 31, 1979. The

court denied the United States' cross-motion for affirmance of Commerce's Determination.

The August 16, 1983 order denied the United States' motion to stay Commerce's filing of the redetermination report required by the March

## Issues

(1) Whether the CIT erred in holding that Commerce is without authority to apply the exchange rate from the preceding calendar quarter in calculating fair value in an antidumping proceeding when prices under consideration are affected by sustained exchange rate fluctuations.

(2) Whether the CIT erred in rescinding Commerce's Amended Final Negative Determination.

## OPINION

### (1) *In General*

Though the CIT did not clearly appear to hold § 353.56(b) invalid, and Melamine recognizes that the appealed order and judgment may be affirmed without reaching that question, the CIT's finding of "conflict" with a statute and Melamine's assertions here that the regulation is invalid, impel an expression of our view.

 When the issue is the validity of a regulation issued under a statute an agency is charged with administering, it is well established that the agency's construction of the statute is entitled to great weight. *Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964); *Selman v. United States,* 498 F.2d 1354, 1356 (1974). Similarly, agency regulations are to be sustained unless unreasonable and plainly inconsistent with the statute, and are to be held valid unless weighty reasons require otherwise. *Smith-Corona Group v. United States,* 713 F.2d 1568, 1575 (Fed.Cir. 1983); *Zemurray Foundation v. United States,* 687 F.2d 97, 100–101 (5th Cir.1982); *Mobil Oil Corp. v. Federal Energy Administration,* 566 F.2d 87, 93 (Em.App. 1977); *Review Committee, Venue VII, Etc. v. Willey,* 275 F.2d 264, 272 (8th Cir.1960). *See also, American Petroleum Institute v. Knecht,* 456 F.Supp. 889, 906 (C.D.Cal. 1978). Applying those guidelines, we disagree with the CIT's indication that conflict exists between 19 CFR § 353.56(b) and 31 U.S.C. § 372.

### (2) *Relationship Between § 353.56(b) and § 372*

As discussed *infra,* the regulation under consideration, § 353.56(b), is derived from a regulation promulgated by Treasury in 1976, a regulation in turn derived from Treasury's administrative response to the United States' decision to abandon the gold standard and to permit the dollar to "float" on international exchange rate markets. The essence of § 353.56(b) is to permit the administering authority (now Commerce) to disregard a margin of dumping when that margin is created *solely* by flexible, temporary fluctuations in the exchange rate of a particular foreign currency against the United States dollar.

Though the CIT referred to § 372 as the "enabling statute", 19 CFR § 353.56 was published on February 6, 1980 (45 Fed.Reg. 8190) under the authority of 5 U.S.C. § 301, and the Trade Agreement Act of 1979, Pub.L. 96–39, section 3(b), 93 Stat. 148, 19 U.S.C. § 2504.

Because § 372 provides for conversion of foreign currency into United States dollars, and because § 353.56(a) refers to fair value conversions as controlled by § 372, Melamine and the CIT focused on whether all fair value calculations must be controlled by § 372.

Because subsection (b) of § 372 expressly limits that statute's application to the "assessment and collection of duties upon merchandise imported into the United States," the United States strenuously urges the view that § 372 does not control Commerce's *investigations,* which involve neither the assessment nor the collection of duties upon imported merchandise.

The United States argues at length that an antidumping proceeding involves two distinct phases, a fair value investigative

---

25, 1983 order. The effect of the August 25, 1983 order staying a denial of a motion to stay is at best unclear. It would appear that the order staying the March 25, 1983 order rendered moot the August 16, 1983 order.

phase to which § 372 is not applicable and an assessment-collection phase to which § 372 is applicable. Though the argument is stated in terms of all antidumping investigations, the United States then says "It must be emphasized that 31 U.S.C. § 372 is generally applicable even in the investigative phase (19 CFR 353.56(a)) *unless* the limited circumstances in which the 'special rule' contained in 19 CFR § 353.56(b) comes into play are present in a particular case." [5]

■ Though Melamine appears to recognize some distinction between the two phases described by the United States, it argues in terms of all antidumping duty proceedings and analogizes them to proceedings of the Internal Revenue Service, citing the presence of "assessment and collection" language in 26 U.S.C. § 7421 (the Federal Anti-Injunction Act) and in 31 U.S.C. § 372. On that premise, and though the CIT drew no similar analogy, Melamine says § 372 must control both phases of all anti-dumping duty proceedings. We disagree.

Melamine's argument by analogy rests on court statements that in the enforcement of the internal revenue laws "assessment" includes the "preliminary investigation as well as the final determination", *Calkins v. Smietanka*, 240 F. 138, 146 (N.D.Ill.1917), and "includes the whole statutory mode of imposing the tax." *Jackson Lumber Co. v. McCrimmon*, 164 F. 759, 763 (N.D.Fla.1908). Melamine's citations of taxpayers' suits brought in contravention of the Anti-Injunction Act are inapposite.

Moreover, as discussed *infra*, Congress has afforded Commerce considerable latitude and discretion in implementing the antidumping duty laws, especially during the investigative fair value phase. It would not comport with that intent of Congress to diminish or destroy that latitude and discretion by applying court decisions interpreting a statute governing injunctions against enforcement of different tax laws.

Melamine incorrectly asserts that the ultimate purpose of a fair value investigation and calculation is the assessment and collection of antidumping duties. The purpose of a fair value investigation is to determine whether LTFV sales are occurring to the injury of domestic industry. Such investigations may or may not result in the assessment and collection of antidumping duties.

■ The notion that assessment and collection includes calculation of fair value, so that the two phases must be merged as argued by Melamine, has been laid to rest by the Supreme Court in *United States v. George S. Bush & Co.*, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940), and in *Barr v. United States*, 324 U.S. 83, 65 S.Ct. 522, 89 L.Ed. 765 (1945).

The CIT noted the indication in § 353.-56(a) that currency conversion in fair value determinations "shall be made in accordance" with 31 U.S.C. § 372, and said failure to subject every fair value investigation to § 372 would render the fair value provision in § 353.56(a) "meaningless". We disagree. The language of § 353.56(a) is not here involved and application of that subsection of the regulation is not affected by application of § 353.56(b).

What may have appeared to the CIT as a conflict between subsections (a) and (b) of § 353.56 is simply the not uncommon situation in which (b) is but an exception to (a). Sustaining the application of § 353.56(b) in this case does not preclude the United States from continuing to apply § 353.56(a) and § 372 to fair value determinations in normal exchange rate situations. As the language makes plain, § 353.56(b) establishes a "special rule" applicable only to those abnormal situations in which an *artificial* margin is caused *solely* by rapidly fluctuating, temporary exchange rates.

---

**5.** Commerce is statutorily required to *assess* duties on the basis of a price comparison between the foreign market value of the merchandise at the time of exportation to the United States and the United States price at the time of importation, 19 U.S.C. § 1677b(a)(1), and the regulations so reflect. 19 CFR § 353.56.

We need not, therefore, discuss in detail the extended arguments of the parties on whether § 372 must control all conversions involved in all phases of all antidumping proceedings. We have been cited to nothing in the record or briefs to indicate that § 372 forbids or prohibits the promulgation of a "special rule" applicable only to fair value investigations, permitting "a reasonable period of time" for price adjustments in view of sustained changes in exchange rates, and providing that price differences resulting *solely* from *temporary* exchange rate fluctuations will not count in fair value investigations.

The CIT said that when a statute and a regulation "promulgated in accordance with the statute [§ 372]" are in conflict, the statute must prevail. That statutes prevail over conflicting regulations is a truism. In the present case, however, we detect no disabling conflict between a regulation applicable to fair value investigations in a special exchange rate situation and a statute governing currency conversions in the assessment and collection of duties. The regulation was not "promulgated in accordance with" § 372, and we have been cited to no basis for finding it in conflict with the authority under which it was promulgated (5 U.S.C. § 301, Trade Agreement Act of 1979, Pub.L. 96–39, section 3(b), 93 Stat. 148; 19 U.S.C. § 2504). Thus no basis has been shown for an assertion of conflict between § 372 and § 353.56(b).

(3) *Authority for Issuance of § 353.56(b)*

The CIT said the United States had not demonstrated "statutory authority for the enactment of 19 CFR § 353.56(b)."

In *Smith-Corona Group v. United States, supra,* at 1571, this court said "[t]he Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, establishes an intricate framework for the imposition of antidumping duties in appropriate circumstances. The number of factors involved, complicated by the difficulty in quantification of these factors and the foreign policy repercussions of a dumping determination, makes the enforcement of the antidumping law a difficult and supremely delicate endeavor. The Secretary of Commerce ... has been entrusted with responsibility for implementing the antidumping law. The Secretary has broad discretion in executing the law." The court further said, "Our review of the statute reveals tremendous deference to the expertise of ... Commerce in administering the antidumping law." *Id.* at 1582.

Commerce is not, of course, at liberty to violate a statute. Yet Congress has recognized its own inability to anticipate in its legislation all "appropriate circumstances", every "factor", and all "foreign policy repercussions". There must be a statutory grant of authority, but the authority to issue a particular regulation may be express or implied from the grant. Commerce may not act arbitrarily or unreasonably, and may not abuse the discretion Congress has granted, but there is no stultifying requirement that it cite a statute detailing *in haec verba* the specific action it may take when confronted with a particular set of circumstances among the myriad that may occur. To so require would be to envisage a prescient Congress in continuous session and devoting a majority of its effort to writing statutes on the daily management of our international trade relations, including much of what may be considered administrivia.

In the legislative history of the Trade Agreements Act of 1979, Congress spoke specifically of its intent to grant "greater flexibility" to Commerce in conducting a fair value investigation:

"The antidumping duty is equal to the margin of dumping, i.e., the amount by which the foreign market value exceeds the United States price of the merchandise. The provision retains the concept of 'fair value' for purposes of the investigative phase of an antidumping proceeding. The term fair value is not defined in current law nor in the bill. The Committee intends the concept to be applied essentially as an estimate of 'foreign market value' during the period of investigation so as to provide the Authority with greater flexibility in administration of the law."

H.Rep. No. 96–317, 96th Cong., 1st Sess. 59 (1979).

International currency realignments resulted from President Nixon's August 25, 1971 temporary suspension of convertibility of the dollar into gold or other reserve assets, resulting, as above indicated, in a "floating" dollar. On March 30, 1972, Treasury announced that in reaction to "recent international currency realignments" it would examine and consider many factors, including all the circumstances surrounding a given contract and importations made pursuant to it in determining whether margins resulting from international currency realignments warranted a determination of sales at less than fair value. The December 18, 1971 Smithsonian Agreement, designed to maintain fixed exchange rates, broke down by March 1973. On March 22, 1973, Treasury announced that in administering the antidumping duty laws it would disregard price discrepancies resulting solely from currency realignments occurring within 45 days of a change in exchange rates.

In light of the Trade Act of 1974 (P.L. 93–618, 83 Stat. 1976) and its attendant substantive and procedural changes to the antidumping duty laws, Treasury published proposed regulations revising 19 CFR Part 153 (the antidumping duty regulations) on July 23, 1975. 40 Fed.Reg. 30825, *et seq.* Among the proposed revisions to the antidumping duty regulations was section 153.-52(b) which contained a "special rule" designed to reflect the new flexible, rather than fixed, exchange rate system. The proposed special rule provided that:

"(b) For purposes of the fair value investigation, if a significant currency realignment occurred which affected the prices under consideration, no price discrepancies resulting solely from such currency realignment will be taken into account in fair value investigations with respect to relevant transactions taking place within 45 days of such realignment."

40 Fed.Reg. 30836 (July 23, 1975).

In the final revision of 153.52(b), the 45 day period was replaced with "a reasonable time", for the reason explained at 41 Fed. Reg. 26214 (June 25, 1976):

"Paragraph (b) of section 153.52 has been changed to reflect the current international monetary system which is characterized by flexible, rather than fixed, currency exchange rates. The revised paragraph will provide that for purposes of fair value investigations in which the facts justify it, a longer term basis for measuring changes in exchange rates may be utilized in making price comparisons. Less than fair value sales should therefore not occur in such cases as a result of brief exchange rate fluctuations."

Thus the concept of disregarding margins created artificially and solely by exchange rate fluctuations ("currency realignments") was developed immediately after the need arose and has remained available as an administrative practice ever since.

Indeed, Congress had constructive notice of the concept when it enacted the major revision of the antidumping duty laws found in the Trade Agreements Act of 1979. As above indicated, Congress indicated no intent to dissuade or prohibit the administering authority from using in fair value investigations a "special rule" relating to currency realignments.

On the present record, Commerce fully articulated the rationale underlying 19 CFR § 353.56(b):

*Exchange Rate Fluctuations*

§ 353.56(b) of the Department of Commerce Regulations governs situations where rapidly fluctuating exchange rates distort price comparisons between national markets. For purposes of fair value investigations, manufacturers, exporters, and importers concerned will be expected to act within a reasonable period of time to take into account price differences resulting from sustained changes in prevailing exchange rates. Where prices under consideration are affected by tem-

porary exchange rate fluctuations, no differences between the prices being compared resulting solely from such exchange rate fluctuations will be taken into account in fair value investigations.

The purpose of this regulation is clear. Antidumping investigations are meant to determine whether prices of merchandise sold in the United States are at less than "fair value." When exchange rates are fluctuating substantially, a given dollar price of a product in the United States could change technically from fair to "unfair" literally from day to day, even if the foreign price of the product denominated in the foreign currency, also remained constant. This result is not called for by the language or purpose of the Act. It would be unrealistic to expect business to change prices instantaneously to take account of fluctuating exchange rates. So too, weekly price changes could create substantial confusion and inconvenience for the customers of that business.

The regulation, then, allows a reasonable period in which the business may take sustained exchange rate fluctuations into account. The regulation further instructs that temporary fluctuations should not be the sole basis for determinations of less than fair value sales. Businesses are to be given time to assess whether one currency has truly appreciated against another before changing their pricing practices.

45 Fed.Reg. at 29620.

 We hold that issuance of 19 CFR § 353.56(b) constituted a reasonable exercise of the discretionary authority granted Commerce in the Trade Agreements Act of 1979.

### (4) Preceding Quarter Exchange Rate

Commerce also explained its application of a preceding quarter exchange rate under the "reasonable period" provision of its "special rule" in the present case:

The period covered by this investigation was certainly one of volatile changes in the exchange rate between the dollar and the West German mark (the currency of the third country sales compared with the U.S. sales in this investigation). The dollar dropped steadily during the month of October 1978, rebounded sharply after President Carter's announcement in late October of special measures to strengthen the dollar, and then declined again in December.

The comparison in the March 20 determination was based upon the certified quarterly exchange rate of the Federal Reserve Board. Comparison of prices for sales during a given quarter were based on the exchange rate for that quarter. The results were the margins noted earlier. When the comparison is made on the basis of the exchange rate in the preceding quarter [a one-quarter lag], however, there are no margins. There seems little doubt that this situation is exactly the type contemplated in § 353.56(b). The appropriate approach will vary from case to case, depending on the particular facts of the case.

The conclusion that there had been no sales at less than fair value should have been reached simply by applying the regulation, because the margins were the sole result of exchange rate fluctuation. The precedents cited by respondent, particularly Motorcyles from Japan (43 FR 48754), reinforce this result. In that case the Treasury Department specifically applied a "one quarter lag" in determining whether there were less than fair value sales during a period in which the value of the Japanese yen changed significantly. Counsel for petitioner has argued that this case is not relevant because it involved an offer of price assurances by the respondent. The fact that an offer of price assurances was involved does not alter the proper method for making a fair value comparison, however.

For the reasons stated above, I [6] conclude that melamine in crystal form from

---

6. Robert E. Hemstein, Undersecretary for International Trade, Department of Commerce.

the Netherlands is not being nor is likely to be sold at less than fair value and the final determination is amended to reflect this determination.

45 Fed.Reg. at 29620.

Melamine does not challenge the factual underpinnings of Commerce's application of the 90 day lag rule. It is undisputed that the relevant period (November 1, 1978 through April 30, 1979) was characterized by volatile changes in the exchange rate between United States dollar and the West German mark. During the first quarter of 1979 the West German mark jumped 6 percent in value against the U.S. dollar, and then dropped 3.4 percent during the second quarter of 1979.

Because the entire period under investigation was marked by significant exchange rate fluctuations, an exporter pricing his goods during one quarter could not anticipate the effect of volatile exchange rate fluctuations occurring within that quarter. Commerce in the present proceeding used the exchange rate applicable to the quarter in which the sale for exportation was made, as prescribed by § 372, to determine whether a margin existed. That produced a weighted average margin of 2.18 percent. Commerce then, in applying § 353.56(b), looked back one quarter to the exchange rate in effect when the exporter was setting his prices in order to afford a "reasonable period of time to take into account" the exchange rate fluctuations. Application of the exchange rates from the preceding quarter disclosed that the 2.18 percent margin was artificial because it was attributable solely to volatile changes in the exchange rate. Neither the CIT nor Melamine has asserted that the exporter was actually engaged in a dumping operation or that the margin was in this case due to any cause other than volatile exchange rate fluctuations. Nor is it suggested that Commerce would have hesitated to make an affirmative determination if actual LTFV sales within the control of the exporter had been shown.[7]

Though the CIT noted that the United States had cited "no authority for using a 90-day lag rule", that authority stems from Commerce's duty to enforce fairly the antidumping laws by determining whether LTFV sales are or are *not* occurring. The purpose of the antidumping law, as its name implies, is to discourage the practice of selling in the United States at LTFV by the imposition of appropriately increased duties. That purpose would be ill-served by application of a mechanical formula to find LTFV sales, and thus a violation of the antidumping laws, where none existed. A finding of LTFV sales based on a margin resulting *solely* from a factor beyond the control of the exporter would be unreal, unreasonable, and unfair.

Affording the exporter a reasonable period of time to adjust its prices to volatile and temporary fluctuations in the exchange rate, on the other hand, is eminently fair and well within the discretion of Commerce in enforcing the antidumping laws by conducting fair value investigations and determining whether LTFV sales are actually occurring. Courts are inappropriate institutions, particularly where as here the record is silent on the question, to determine whether a "reasonable period" would entail a lag of 45 days, or 60 days, or 90 days. It is enough for present purposes to note that Commerce's conclusion that one preceding calendar quarter would provide the "reasonable period of time" envisaged in § 353.56(b) has not been shown to have been unreasonable.

■ Accordingly, in applying the "special rule" of 353.56(b) and affording a one-quarter lag so that a realistic and fair price comparison could be made, Commerce's decision to disregard margins caused solely by temporary fluctuations in the exchange rate, and to reach a Final Negative Deter-

---

7. On appeal, neither party mentioned the CIT's statement that application of the preceding quarter's exchange rate permitted "the foreign exporter 180 days to rectify its pricing practices to insure that it does not sell at LTFV."

mination, was reasonable and neither arbitrary nor in violation of law.[8]

#### (5) The Recision

Melamine says 19 U.S.C. § 1516a(c)(1) requires that a decision by the CIT must control liquidation of all entries occurring on or after the publication of that court decision. If that court decision be overturned on appeal, Melamine says liquidations would then recommence under the original determination. We are unpersuaded that Congress could have intended the yo-yo effect on liquidations that could result from such a practice.

When Melamine filed its present complaint in February, 1979, all entries of melamine from the Netherlands were being liquidated without regard to antidumping duties by virtue of Commerce's Final Negative Determination under 19 U.S.C. § 1673d. Under 19 U.S.C. § 1516a(c)(2), liquidations may be suspended pursuant to a preliminary injunction, and may then be retroactively governed by the *final* court decision. Melamine never sought or obtained a preliminary injunction. Absent an injunction, 19 U.S.C. § 1516a requires that the challenged determination shall govern the liquidation of entries "while the litigation is proceeding." *See* S.Rep. No. 96–249, 96th Cong., 1st Sess. 248 (1979), U.S. Code Cong. & Admin.News 1979, 381, 634.

The litigation is proceeding on appeal and there has been no final court decision on the validity of the challenged determination.

The CIT's decision does not indicate as to how the entries at issue should now be treated. At the government's urging and "upon stipulation of counsel", the CIT, in its August 25, 1983 order (now stayed), suspended liquidation of entries of melamine from the Netherlands after September 5, 1983. Melamine asserts that the recision issue is moot, but if the CIT's "recision" of Commerce's Final Negative Determination were considered as in effect, and though we have reversed on the exchange rate issue, there would be no administrative determination governing liquidation of the entries at issue and no "administrative closing" of the antidumping duty proceeding involving melamine from the Netherlands between November 1, 1978 and April 30, 1979.

■ The CIT improperly rescinded Commerce's determination. The administrative handling of the involved entries of melamine from the Netherlands can be effected only by (1) a preliminary injunction pursuant to 19 U.S.C. § 1516a(c)(2), or (2) a *final* court decision adjudicating the legality, *vel non*, of the challenged determination. 19 U.S.C. § 1516a(e).[9]

---

**8.** Melamine contends that in determining foreign market value nothing is left to Commerce's discretion, because 19 U.S.C. § 1677b(a)(1) requires application of the an exchange rate existing at the time of exportation. That we deal here with fair value, not foreign market value (of which fair value is an estimate), is a fact fatal to Melamine's argument.

Similarly, Melamine argues that because foreign market value is a "price", and fair value is an estimate of that price, Commerce must use the exchange rate in effect at the time of the sale. The argument was not reached by the CIT. It is in any event unavailing in view of our holding that Commerce has discretion to employ a preceding quarter's exchange rates in a fair value investigation when the period under investigation is characterized by sustained exchange rate fluctuations.

Melamine's reliance upon *C.B.S. Imports Corp. v. United States,* 450 F.Supp. 724 (Cust.Ct. 1978), is equally unavailing. That was a reappraisement case, involving an assessment and

collection of customs duties on a basis not here involved.

In its brief, Melamine says, without record citation, that 353.56(b) is unnecessary, because Commerce has consistently ruled that the date of sale for LTFV purposes is the contract date, and exchange rate fluctuations are therefore irrelevant. In view of our holding, we need not discuss the argument.

**9.** 19 U.S.C. § 1516a(e) states:

(e) Liquidation in accordance with final decision.—If the cause of action is sustained in whole or in part by a decision of the United States Court of International Trade or of the United States Court of Appeals for the Federal Circuit—

(1) entries of merchandise of the character covered by the published determination of the Secretary, the administering authority, or the Commission, which is entered, or withdrawn from warehouse, for consumption after the

Accordingly, the order rescinding and remanding Commerce's Amended Final Negative Determination must be *vacated,* and the judgment holding that Commerce acted unlawfully in employing the preceding quarter's exchange rates in its application of 19 CFR § 353.56(b) to its fair value investigation in the present antidumping proceeding must be *reversed.*

VACATED and REVERSED.

date of publication in the Federal Register by the Secretary or the administering authority of a notice of the court decision, and

(2) entries, the liquidation of which was enjoined under subsection (c)(2) of this section,

shall be liquidated in accordance with the final court decision in the action. Such notice of the court decision shall be published within ten days from the date of the issuance of the court decision.