Slip Op 09 - 107

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
|---|---|---|
| DIAMOND SAWBLADES MANUFACTURERS COALITION, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Before: Musgrave, Senior Judge |
| | : | |
| UNITED STATES, | : | Court No. 06-00247 |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| ST. GOBAIN ABRASIVES, INC., EHWA DIAMOND INDUSTRIAL CO., LTD., and SHINHAN DIAMOND INDUSTRIAL CO., LTD., | : | |
| Defendant-Intervenors. | : | |

|  |  |  |
|---|---|---|
| DIAMOND SAWBLADES MANUFACTURERS COALITION, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | Court No. 09-00110 |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| SAINT-GOBAIN ABRASIVES, INC., HEBEI JIKAI INDUSTRIAL GROUP CO., LTD., HUSQVARNA CONSTRUCTION PRODUCTS NORTH AMERICA, INC., EHWA DIAMOND INDUSTRIAL CO., LTD., and BOSUN TOOLS GROUP CO., LTD., | : | |
| Defendant-Intervenors. | : | |

## OPINION AND ORDER

[Granting application for a writ of mandamus as to the U.S. Department of Commerce and denying as moot the mandamus action as to the U.S. International Trade Commission, this decision combines two separate matters, more specifically identified in the foregoing captions, due to their having similar and interrelated questions of law. While it may appear inconsistent that the court herein reaches two different conclusions as to the two separate writs of mandamus requested, this apparent anomaly is dictated by different aspects of the law.]

Dated: September 30, 2009

*Wiley, Rein & Fielding LLP* (*Daniel B. Pickard*), for the plaintiff.

*James M. Lyons*, General Counsel, *Neal J. Reynolds*, Assistant General Counsel, Office of the General Council, U.S. International Trade Commission (*Charles A. St. Charles*), for the defendant U.S. International Trade Commission.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Franklin E. White*, *Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, (*Delisa M. Sanchez*); Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (*Mark B. Lehnardt*), Of Counsel, for the defendant U.S. Department of Commerce.

*Akin Gump Strauss Hauer & Feld LLP* (*Spencer S. Griffith*, *J. David Park*, *Jarrod M. Goldfeder*, *Lisa W. Ross*, and *Valerie A. Slater*), for the defendant-intervenors Ehwa Diamond Industrial Co., Ltd. and Shinhan Diamond Industrial Co., Ltd.

*Fischer Fox Global PLLC* (*Lynn M. Fischer Fox*), for the defendant-intervenor Saint-Gobain Abrasives, Inc.

*Alston & Bird, LLP* (*Kenneth G. Weigel* and *Elizabeth M. Hein*), for the defendant-intervenors Hebei Jikai Industrial Group Co., Ltd., and Husqvarna Construction Products North America, Inc.

*deKeiffer & Horgan* (*Gregory S. Menegaz*), for the defendant-intervenor Bosun Tools Group Co., Ltd.

Musgrave, Senior Judge: Before the court are two applications for relief in the nature

of writs of mandamus instituted by the plaintiff Diamond Sawblades Manufacturers Coalition

("DSMC"), one of which (Court No. 06-00247) seeks to compel the United States International

Trade Commission ("ITC" or the "Commission") to publish notice of its affirmative remand determination in the *Federal Register* as a legal consequence of this court's judgment in *Diamond Sawblades Mfr's Coalition v. United States*, Slip Op. 09-5, 2009 WL 289606 (CIT Jan. 13, 2009) ("Slip Op. 09-5") (sustaining the ITC's affirmative remand determination), and the other (Court. No. 09-00110) seeking to compel the International Trade Administration, United States Department of Commerce ("Commerce" or the "Department") to issue antidumping duty orders and order the collection of cash deposits. Both matters concern the question of whether, absent a stay, the ITC and Commerce are legally obligated to effectuate the decisions of this Court if the case has been appealed. For the reasons set forth below, the court concludes that they must. The court will grant the plaintiff's requested relief as to Commerce, but will deny the request, on the ground of mootness, as to the ITC.

### I. Background

#### A. Statement of Facts

Some familiarity with Court No. 06-00247 is presumed. In July 2006, the ITC published its final determination that a domestic industry was not materially injured, or threatened with material injury, by reason of imports of diamond sawblades from China and Korea. *Diamond Sawblades and Parts Thereof From China and Korea,* 71 Fed. Reg. 39,128 (ITC) (July 11, 2006) ("Original Determination"). DSMC, a domestic industry coalition of diamond-sawblade manufacturers, challenged the ITC's final negative injury determination in this Court.[1] In reviewing

---

[1] In an antidumping duty investigation, Commerce determines whether a product is being sold in the United States at less than fair value (*i.e.*, "dumped"), and the U.S. International Trade Commission ("ITC") determines whether an industry in the United States is materially injured or

(continued...)

the determination, the court found that the ITC had failed to provide an adequate explanation or substantial evidentiary support for certain findings. The court remanded the matter to the ITC and instructed the Commission to reconsider and explain more fully its negative-injury determination in light of the court's opinion. *Diamond Sawblades Mfr's Coalition v. United States*, Slip Op. 08-18 2008 WL 576988 (Feb. 6, 2008). On remand, the Commission considered the court's instructions and reopened the record for the purpose of collecting additional information. It then considered the new information it gathered and issued a new decision on May 14, 2008. In that decision, the Commission again found that the domestic industry was not materially injured by reason of subject imports but reversed its position on the issue of threat-of-material-injury. *Diamond Sawblades and Parts Thereof from China and Korea*, Investigation Nos. 731-TA-1092 and 1093 (Final) (Remand),

---

[1] (...continued)
threatened with material injury. 19 U.S.C. § 1673. Pursuant to the applicable statutory provisions, if the ITC makes an affirmative preliminary injury determination, Commerce then issues its preliminary and final dumping determinations. If Commerce makes a preliminary determination that merchandise is being dumped, Commerce must suspend liquidation pending completion of the investigation. 19 U.S.C. § 1671b(d)(2). In these instances, Customs will not know the exact amount to assess, as antidumping duty, at the time when the goods are actually entered, because the duty is necessarily determined after the goods enter the United States. *See* 19 C.F.R. § 351.213(a). Accordingly, to secure payment of antidumping duties, an importer must make cash deposits of the estimated duties at the time of entry. 19 U.S.C. §§ 1673b(d)(1)(B), 1671 d(c)(1)(B)(ii), 1671 e(a)(3). At liquidation Customs collects any additional fees due or refunds excess moneys deposited, together with interest. 19 U.S.C. § 1505(b).

If Commerce finds that dumping has occurred in its final determination, the ITC must make a final determination as to whether the domestic industry has been materially injured or threatened with material injury as a result of the dumped imports. *See* 19 U.S.C. §§ 1673, 1673b, 1673d. If the ITC's final determination is affirmative, Commerce must publish an antidumping duty order "[w]ithin 7 days after being notified by the Commission of an affirmative determination under section 1673d(b)." 19 U.S.C. § 1673e(a). If the ITC's final determination is negative, however, the investigation terminates, and Commerce is required to terminate the suspension of liquidation of entries, release bonds and securities, and refund cash deposits. 19 U.S.C. § 1673d(c)(2).

USITC Pub. 4007 (May 2008) ("Remand Determination"). The court sustained the Remand Determination on January 13, 2009. *Diamond Sawblades*, Slip Op. 09-5.

On January 22, 2009, the ITC notified Commerce that this court had issued a final decision sustaining the ITC's affirmative Remand Determination and that the court's decision was "'not in harmony with' the Commission's original negative injury determination." Pub. Doc. No. 3 at 1 (Court No. 09-110). As directed by 19 U.S.C. § 1516a(c)(1) and *Timken Co. v. United States*, 893 F.2d 337, 341 (Fed. Cir. 1990), Commerce published notice of the court's decision in the *Federal Register* on February 10, 2009. *See Diamond Sawblades and Parts Thereof from the People's Republic of China and the People's Republic of Korea: Notice of Court Decision Not In Harmony With Final Determination of the Antidumping Duty Investigations* (Commerce Dept.) 74 Fed. Reg. 6570 (Feb. 10, 2009) ("*Timken Notice*"). In the *Timken Notice*, Commerce stated that liquidation of subject import entries would be suspended within ten days of that notice, and that an antidumping duty order would be issued if notified by the ITC that Slip Op. 09-5 "is not appealed or is affirmed on appeal." *Id*.

Shortly after publication of the *Timken Notice*, DSMC submitted a letter to Commerce suggesting that, in addition to suspension of liquidation, Commerce should order the collection of cash deposits. Pub. Doc. 2 (Court No. 09-110). The Department responded that it would not order the collection of cash deposits until issuance of a final and conclusive court decision and that "[t]he Department interprets *Timken* to require suspension of liquidation, but not to direct the Department to require cash deposits on or after the date of the notice." Department of Commerce ("DOC") Mem. at 4.

In a similar correspondence with the ITC, DSMC requested that the Commission publish notice of the affirmative Remand Determination in the *Federal Register*. DSMC noted that although the ITC had, in a similar case, delayed notice publication until all appeals had been exhausted, delay was not appropriate in the current matter. DSMC asserted that 19 U.S.C. § 1673(d) "requires the Commission to also publish a notice in the Federal Register regarding the remand determination[; therefore] . . . we ask that the Commission publish such a notice in order to dispel serious confusion that has arisen with respect to the relief due to the domestic industry in this case . . . ." *DSMC Letter*, ITC Mem. at Attach. B.

On March 13, 2009, the defendant-intervenors Ehwa Diamond Industrial Co., Ltd., and Saint-Gobain Abrasives, Inc., filed notices of appeal in the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"). The ITC did not appeal. As promised in the *Timken Notice*, Commerce did not publish an antidumping duty order and did not direct the collection of cash deposits. Further, in a letter dated April 9, 2009, the Commission informed DSMC that, *inter alia*, it disagreed with DSMC's interpretation of section 1673d(d) and that it would not publish notice of its Remand Determination at that point in time. ITC Mem. at Attach D. Thereafter, DSMC filed in this court a petition for a writ of mandamus (Court No. 09-00110) to compel the Department of Commerce to issue antidumping duty orders and to require the collection of cash deposits in the respective investigations. One week later DSMC filed in this court a second application for a writ of mandamus (Court No. 06-00247) to compel the ITC to publish notice of the affirmative Remand Determination in the *Federal Register*.

## B.  Arguments of the Parties

### 1. *ITC Action (Court No. 06-00247)*

Before the court DSMC argues that it is clearly and indisputably entitled to the relief it seeks because "[t]he Tariff Act of 1930 states that whenever the ITC makes a final threat of material injury determination under [section] 1673d(b), it 'shall publish notice of its determination in the *Federal Register*.'" DSMC  (No. 06-00247) Mem. at 3-4 (quoting 19 U.S.C. § 1673d(d)). DSMC contends that it has no other means to obtain relief because publication of notice of the affirmative determination is "necessary to effectuate this court's judgment." *Id*. at 1.  This is so, DSMC contends (and the defendant-intervenors concur), because 19 U.S.C. § 1673e(b)(2) specifies that when the ITC's determination is affirmative for threat-of-material-injury only, antidumping duties may not be assessed for any time period prior to the date of publication.  Under this scheme, argues DSMC, the ITC's refusal to publish notice of the affirmative Remand Determination until after all appeals have been decided (which may take almost two years) fundamentally diminishes the relief to which it is legally entitled.

The ITC presents two central arguments as to why it does not have a current duty to publish notice of the Remand Determination.  First, the ITC contends that delaying publication of remand determinations is consistent with the requirements of the statutory scheme.  According to the Commission, "two separate sets of statutory provisions govern the publication of Commission and Commerce determinations, depending on whether the determinations were issued during an antidumping investigation or a court action."  ITC Mem. at 9.  The Commission maintains that section 1673d, which provides many of the procedural requirements governing investigations at the administrative level (*e.g.*, time limits, consequences of preliminary and final determinations), *only*

governs procedures in the context of the original investigation. Accordingly, says the ITC, the publication requirement provided in section 1673d is, likewise, a procedure that applies *only* to the original final determination that resulted from the administrative-level investigation. ITC Mem. at 11.

On the other hand, the ITC explains, publication in the context of judicial review is governed by sections 1516a(c) and (e). Those provisions "specify" that when the ITC issues a remand determination adverse to the original determination that is subsequently affirmed by the Court of International Trade ("CIT"), the only publication required at that point is governed by section 1516a(c)(1). Consequently, notes the ITC, section 1516a(c)(1) provides that Commerce, not the ITC, must publish notice of a court decision "not in harmony" with the original determination. ITC Mem. at 12.

Second, the ITC argues that DSMC is simply not entitled to the relief it seeks because the type of publication it requests is tantamount to treating the court's decision as "final and conclusive"[2] and that, contrary to DSMC's allegations, "the Federal Circuit has consistently stated that a remand determination . . . is not to be given full and final effect until the end of [] all appellate proceedings, even if the Court of International Trade has affirmed the determination." ITC Mem. at 14-15 (citing *Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990). The Commission argues further that section 1516a(c)(3) states expressly that the agencies (involved) may not take action to

---

[2] Throughout this opinion, the court will use the phrase "final and conclusive" to describe the type of finality that occurs when a court decision is no longer subject to appeal, as opposed to the type of finality that simply "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *St. Louis I.M. & S.R. Co. v. Southern Express Co.*, 108 U.S. 24, 28 (1883)).

effectuate an adverse court decision until the matter has been remanded to the agency pursuant to a final and conclusive court decision. According to the ITC, section 1516a(c)(3) provides "that the courts may only remand the matter to the Commission for 'disposition consistent with the final disposition of the court' only <u>after</u> there has been a '<u>final disposition</u> of {the} action . . . {that} is not in harmony with the published {original} determination of . . . the Commission.'" ITC Mem. at 13 (quoting 19 U.S.C. § 1516a(c)(3)) (ITC's alterations). In other words, the ITC maintains that because the court's decision in Slip Op. 09-5 is pending appeal before the Federal Circuit, the ITC has no duty to effectuate that decision (by publishing notice of the affirmative Remand Determination) until the matter has been remanded pursuant to a final and conclusive decision on the appeal.

Finally, the ITC argues that, even if this court disagrees with the ITC's interpretation of the statutory scheme, the court must defer to that interpretation because it is reasonable. The Commission notes that, pursuant to the doctrine set forth in *Chevron*, "a reviewing court must accord substantial weight to the Commission's reasonable interpretation of the statute it administers." ITC Mem. at 19 (referencing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)); *see also* Def.-Int.'s (Court No. 06-00247) Joint Opp. at 13.

### 2. *Commerce Action (Court No. 09-00110)*

DSMC asserts that, pursuant to 19 U.S.C. §§ 1673d(c)(2) and 1673e(a), Commerce's obligation to issue and publish antidumping duty orders and collect cash deposits was triggered when it received the ITC's notice that this court had issued a final decision sustaining the affirmative Remand Determination. DSMC No. 09-00110 Mem. at 5-6. *See* 19 U.S.C. § 1673d(c)(2) (requiring Commerce to issue an antidumping duty order if the ITC and Commerce both issue affirmative final

determinations) and 1673e(a) (requiring Commerce to publish an antidumping duty order "[w]ithin seven days after being notified by the Commission of an affirmative determination under 1673d(b)"). DSMC contends further that in *Decca Hospitality Furnishings, LLC v. United States*, 30 CIT 357, 427 F. Supp. 2d 1249 (2006), the Court established that a remand determination legally replaces the original determination, and that Commerce is obligated to take action in accordance with a final determination regardless of whether it was issued in the original investigation or pursuant to a court-ordered remand. DSMC thus asserts that the Department's failure to issue antidumping duty orders and collect cash deposits contravenes its statutory obligation under § 1673e(a), fails to give full effect to the judgment of this court, "and denies [DSMC] relief to which it has an indisputable right." DSMC No. 09-00110 Mem. at 3.

Commerce argues that it presently has no authority to publish antidumping duty orders or to require the posting of cash deposits in this case. Commerce asserts that it "derives its statutory authority to publish an antidumping duty order from its receipt of notice from the ITC of its final affirmative injury determination," and that, although it had received the ITC's notice that the affirmative Remand Determination had been sustained by a final court decision, that notice was issued for the "sole purpose" of enabling Commerce to publish the *Timken Notice*. DOC Mem. at 10. "Nowhere in the letter," states Commerce, "does the ITC state that the Remand Determination constitutes a section 1673d(b) 'final determination' of affirmative injury, as required by section 1673e(a) before Commerce may publish an order." *Id.*

Commerce further notes that, other than *Decca*, DSMC is unable to provide any support for its position that the Department has a duty to instruct the collection of cash deposits prior to a conclusive court decision. DOC Mem. at 11. The Department contends that "the holding in

*Decca* – that Commerce was required to adjust the cash deposit rate to the rate determined in an involuntary remand determination relating to a case that had been appealed to the Federal Circuit – was erroneously based upon a misreading of *Timken*" and should be disregarded. It asserts further that, contrary to DSMC's arguments and the "aberrant" *Decca* opinion, "[t]he *Timken* court explicitly stated" that when a CIT decision that is "adverse" to the original agency determination is appealed, the sole effect of the CIT's decision is the suspension of liquidation. DOC Mem. at 13 (citations omitted). Commerce claims to be

> [un]aware of any case in which any court has held that Commerce has a clear duty to treat a decision of this Court as a "final" and "conclusive" decision during the pendency of an appeal to the Federal Circuit. As *Timken* made clear, a decision of this Court not in harmony with the agency determination merely removes the agency's presumption of correctness.

*Id*.

Finally, Commerce asserts that denying the writ of mandamus would be "the right outcome because suspension of liquidation preserves the *status quo* and parties' substantive rights to the eventual outcome while the agency's determination is no longer presumed correct and the conclusive outcome is uncertain." DOC Mem. at 21.

For the most part, the defendant-intervenors echo the arguments set forth by the Commission and Commerce, adding that DSMC does not have a clear and indisputable right to the relief it seeks from either agency because the ITC's Remand Determination is not a "final decision." The defendant-intervenors further echo that DSMC's arguments are essentially unsupported because they are premised upon the "aberrant *Decca* case." Def.-Int's (Court No. 06-00247) Joint Opp. at 15-16. They assert that the Federal Circuit's decisions in *Timken* and *Hosiden Corp. v. Advanced Display Manufacturers of America*, 85 F.3d 589 (Fed. Cir. 1996) clearly establish that *Decca* was

based upon a misreading *of Timken* and that, contrary to the observations set forth in that opinion, "the Commission's remand determination does not replace the original determination until the end of all appellate proceedings." Def.-Int's (Court No. 09-00110) Joint Resp. at 16.

## II. *Jurisdiction and Standard of Review*

This court has "exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930." 28 U.S.C. § 1581(c). Because the court has jurisdiction to determine the effect of, and enforce its own judgments, the court retains jurisdiction over the action to decide the current mandamus actions. Without the power to enforce its judgments, "[t]he judicial power would be incomplete, and entirely inadequate to the purposes for which it was intended." *Bank of the United States v. Halstead,* 23 U.S. (10 Wheat.) 51, 53 (1825).

This court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The powers conferred by statute upon the district courts include supplemental jurisdiction provided in 28 U.S.C. § 1367(a) and mandamus jurisdiction set forth in 28 U.S.C. § 1361 (providing that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."). Section 1367 further provides that in any civil action where district courts have original jurisdiction, those courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within its original jurisdiction that they form part of the same case or controversy. 28 U.S.C. § 1367(a).

*III*. *Discussion*

The common-law writ of mandamus, as codified in 28 U.S.C. §§ 1361, 1651(a) (2006), is a drastic remedy, "to be invoked only in extraordinary situations." *Kerr v. U. S. Dist. Ct. N.D. Cal.*, 426 U.S. 394, 402 (1976). Because a writ of mandamus is "one of the most potent weapons in the judicial arsenal," *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 380 (2004), three conditions must be met before the court may issue a writ. First, the petitioner must demonstrate a clear and indisputable right to the writ. Second, the petitioner must demonstrate that he or she lacks adequate alternative means to obtain the desired relief. And third, "even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 380-81.

A. DSMC's Clear and Indisputable Right to the Writ

The defendants contend that DSMC does not have a "clear and indisputable" right to the writs because neither the ITC nor Commerce has a duty to perform the actions that DSMC seeks. The defendants assert that, except for suspension of liquidation, the decisions of this court are to be given no effect if the case has been appealed to the Federal Circuit. For the reasons set forth below, this proposition must be rejected.

1. *Disposition of Judicial Decisions Pending Appeal*

"We begin with the basic proposition that all orders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458 (1975). If a litigant believes the judgment is incorrect, "the remedy is to appeal, but, *absent a stay*, he must comply promptly with the order pending appeal." *Id*. (emphasis added). The principle that all orders and judgments of courts must be complied with promptly is fundamental to the expeditious and efficient

administration of justice by the courts. *United States v. United Mine Workers*, 330 U.S. 258, 293 (1947). *See also Smith Corona v. United States*, 915 F.2d 683, 688 (Fed. Cir. 1990). In enacting the Customs Courts Act of 1980, Congress confirmed the status of this Court as one "established under Article III of the Constitution of the United States," and empowered the Court with the same plenary powers in law and equity as those possessed by the United States district courts. 28 U.S.C. §§ 251, 1585, 2643(c)(1).

It is without debate that liquidation must await a final and conclusive decision on the matter, and that, as a result, the filing of an appeal essentially stays the effect of the court's decision as far as *liquidation* is concerned. But the defendants here advocate that the relevant statutes and caselaw should be interpreted to expand this "stay" to encompass all other legal consequences of the court's final decision. The practical effect of this interpretation (which defendants do not dispute) would mean that the filing of an appeal by any party essentially nullifies the judgments of this Court to the status of advisory opinions rendered for the purpose of nondeferential Federal Circuit review. On its face, such an interpretation appears contrary to the express intent of Congress to expand the powers of this Court and to provide expeditious judicial review in antidumping cases. In the absence of clear and express statutory language, it cannot be accepted that Congress intended that appealed decisions of this Court would not demand the same fundamental compliance that is to be accorded decisions rendered by the district courts. *Accord Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) (holding that "[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.").

2.  *19 U.S.C. § 1516a(c) & (e):  Effects of Judicial Review*

The defendants' arguments focus primarily on 19 U.S.C. §§ 1516a(c) and (e), which

provide, in pertinent part:

**(c) Liquidation of entries**.

**(1) Liquidation in accordance with determination.**

Unless such liquidation is enjoined by the court under paragraph (2) of this subsection, entries of merchandise of the character covered by a determination of the Secretary, the administering authority, or the Commission contested under subsection (a) shall be liquidated in accordance with the determination of the Secretary, the administering authority, or the Commission, if they are entered, or withdrawn from warehouse, for consumption on or before the date of publication in the Federal Register by the Secretary or the administering authority of a notice of a decision of the United States Court of International Trade, or of the United States Court of Appeals for the Federal Circuit, not in harmony with that determination. Such notice of a decision shall be published within ten days from the date of the issuance of the court decision.

**(2) Injunctive relief.**

In the case of a determination described in paragraph (2) of subsection (a) by the Secretary, the administering authority, or the Commission, the United States Court of International Trade may enjoin the liquidation of some or all entries of merchandise covered by a determination of the Secretary, the administering authority, or the Commission, upon a request by an interested party for such relief and a proper showing that the requested relief should be granted under the circumstances.

**(3) Remand for final disposition.**

If the final disposition of an action brought under this section is not in harmony with the published determination of the Secretary, the administering authority, or the Commission, the matter shall be remanded to the Secretary, the administering authority, or the

Commission, as appropriate, for disposition consistent with the final disposition of the court.

* * *

**(e) Liquidation in accordance with final decision.**

If the cause of action is sustained in whole or in part by a decision of the United States Court of International Trade or of the United States Court of Appeals for the Federal Circuit–

(1) entries of merchandise of the character covered by the published determination of the Secretary, the administering authority, or the Commission, which is entered, or withdrawn from warehouse, for consumption after the date of publication in the Federal Register by the Secretary or the administering authority of a notice of the court decision, and

(2) entries, the liquidation of which was enjoined under subsection (c)(2) of this section,

shall be liquidated in accordance with the final court decision in the action. Such notice of the court decision shall be published within ten days from the date of the issuance of the court decision.

19 U.S.C. §§ 1516a(c), (e).

The Commission asserts that it owes no duty to the plaintiff because "the Federal Circuit has consistently stated that, under [sections] 1516a(c) [and] (e), a remand determination is not to be given final and conclusive effect until the end of the entire appellate process, even if the Court of International Trade has sustained that determination." ITC Mem. at 22. The Commission's assertions are beside the point, however, because contrary to the implications of this argument, requiring prompt compliance with the court's judgment is not synonymous with "treatment of that judgment as final and conclusive." As noted above, it is well established that under section 1516a(e), liquidation must await a final and conclusive decision on the matter. The defendants,

however, and with little support, intentionally conflate liquidation with any and all *other effects* that flow as a consequence of the court's decision.

The fact that liquidation must await a final and conclusive court decision does not imply that all other legal obligations resulting from the court's decision must likewise await a conclusive decision. Liquidation for customs duty purposes is the "final computation or ascertainment of duties . . . accruing upon entry" of goods from abroad into the United States. 19 U.S.C. § 1500(d). *See Norsk Hydro Can., Inc. v. United States*, 472 F.3d 1347, 1351 (Fed. Cir. 2006). Final liquidation occurs only once for each entry of goods, and as a general principle may not be subsequently undone.[3] *See Cambridge Lee Indus. v. United States*, 916 F.2d at 1579 (Fed. Cir. 1990) (holding that "[o]nce an entry has been liquidated, the duties paid cannot be recovered even if the payor subsequently prevails in its challenge to the antidumping order."); *Zenith Radio Corp. v. United States,* 710 F.2d 806, 810 (Fed. Cir. 1983). Liquidation is not the same as the collection of cash deposits, nor is it the same as issuance of an antidumping duty order, and has little to do with the publication notice of an affirmative-injury determination. The statutes refer to each concept distinctly. *Compare* 19 U.S.C. §§ 1673b(d), 1673d(c)(1)(B)(ii), 1673e(a), 1673e(c)(3), 1675, 1673f(b)(2) *and* 1677g (referring to cash deposits) *with* 19 U.S.C. §§ 1500, 1504, 1505, 1514, 1516a *and* 1520 (referring to liquidations) *and* 1673 (referring to antidumping duty orders) *and* 1673d(b) (referring to publication). Accordingly, it is inappropriate to presume that Congress used the term "liquidation" in 19 U.S.C. § 1516a to refer to cash deposits or issuance of an antidumping

---

[3] Consequently, several statutes under Title 19 of the United States Code provide for the suspension of liquidation, which require expressly, or have been interpreted to require, that suspension of liquidation continues until the matter has been finally and conclusively decided. *See*, *e.g.*, 19 U.S.C. §§ 1514; 1516(c)(2).

duty order. *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1381 (Fed. Cir. 2001) (noting that "where Congress has included specific language in one section of a statute but has omitted it from another, related section of the same Act, it is generally presumed that Congress intended the omission."). Accordingly, the fact that liquidation must await a final and conclusive court decision has no bearing on Commerce's duty to issue antidumping duty orders or instruct the collection of cash deposits, or on the ITC's obligations to publish notice of an affirmative determination.

### 3. *Precedential Interpretation of 19 U.S.C. § 1516a*

The most detailed analysis of sections 1516a(c)(1) and (e) is set forth in *Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990), to which all parties reference as supportive of their positions. In *Timken*, this Court, after having previously issued a final decision sustaining the Department's remand determination, ordered Commerce to publish (under § 1516a(c)(1)) notice of a court decision "not in harmony" with the original determination. Prior to the mandamus action, Commerce had refused to publish the notice because it had interpreted section 1516a(c)(1) publication to require a final and conclusive decision, and the CIT decision—which was pending appeal—was not. Hence, when the mandamus order was appealed, the only question to be resolved by the Federal Circuit was when (or whether) Commerce was required to publish a *Federal Register* notice of an adverse court decision, regardless of the fact that the case had been appealed. The Federal Circuit affirmed the CIT's issuance of mandamus and noted its disagreement with Commerce's interpretation, stating:

> Unless the agency is required to publish notice of a CIT decision not in harmony within 10 days of the issuance of the decision (regardless of the time for appeal or of whether an appeal is taken), § 1516a(c)(1) would require that the agency's determination continue to govern entries even after the CIT's decision. However, the House Committee report, in discussing § 1516 (a), states that the agency's

determination will govern only that merchandise which is "entered prior to the *first decision of a court* which is adverse" to that determination.

*Timken*, 893 F.2d at 340.

The Federal Circuit's analysis of the term "final" as it is used in section 1516a(c)(1) and (e) was central to its holding in *Timken*. The Court distinguished between the finality that occurs when the district court "is done with the matter," and issues final judgment, and the finality that is achieved when the appellate process has run its course and the decision is no longer subject to appeal or collateral attack (*i.e.*, for purposes of this opinion, "final and conclusive," *see* note 2). *See* 893 F.2d at 339. Although Commerce in that case had taken the position that the latter definition applied to its duty to publish notice of a court decision not in harmony with an agency determination under the judicial review provisions of 19 U.S.C. §§ 1516a(c)(1) and (e), the Federal Circuit concluded otherwise:

> [T]he terms "decision" and "court decision" are used in § 1516a(c)(1) and (e) to denote a decision which is final as far as the rendering court is concerned, even though that decision may be subject to appeal. In support of this interpretation, we merely point to the last sentence of § 1516a(c)(1), which states: "Such notice of a decision shall be published within ten days from the date of the issuance of the court decision." It is nonsensical to say that a court decision *issues* only when the time for appeal expires; a decision *issues* when judgment is entered. Nor do we find it credible to say that a CIT decision does not exist until the time for appeal expires; such an interpretation is contrary to both the common meaning of the term and its use in statutes such as 28 U.S.C. § 1295(a)(5) and 28 U.S.C. § 2645.[FN]6
>
> [FN]6. We do, however, agree that a decision must be "final" in the sense that the CIT has entered final judgment in order to require publication of notice under § 1516a(c)(1) and (e). This is the strict holding of *Melamine Chemicals, Inc. v. United States,* 732 F.2d 924 (Fed. Cir.1984) . . . .

*Timken*, 893 F.2d at 340.

In sum, the *Timken* Court determined that, although the section 1516a(e) liquidation directive required a *final and conclusive* court decision, the publication directed by section 1516a(c)(1) did not:  Publication was required if the CIT had issued a final judgment on the matter– *regardless of whether that judgment had been appealed*.  This case gave rise to the term "*Timken Notice*," because it established the parameters of section 1516a(c)(1) notice-publication. *See Timken*, 893 F. 2d at 340.

However, other than a footnote in *Timken* that is arguably *dictum*, the Federal Circuit has never addressed directly the question of whether filing of an appeal suspends any other legal consequence of a CIT decision sustaining a remand determination, such as those at issue here. That footnote, which discusses cash deposits, appears to be the only clear indication of the Federal Circuit's position on the matter:

> The timing of publication of notice is of great importance to the parties. Under section 1516a(c), unless liquidation is enjoined by the CIT, liquidation continues under the original Commerce determination until publication of a CIT or Federal Circuit decision not in harmony with Commerce's determination. Thus, in the present case, liquidation of CMEC's entries is currently taking place without assessment of antidumping duties, but would be suspended *and made subject to collection of estimated antidumping duties of 4.69% upon publication of notice of the March 22, 1989 CIT decision.*

*Id*. (emphasis added).  Even if *dictum*, the above-quoted passage is persuasive evidence that the Federal Circuit, at least in the context of *Timken*, assumed that (1) the collection of cash deposits would commence upon publication of the *Timken Notice* and that (2) publication was of "great importance" to the litigants precisely because of its effect on cash deposits.  At a minimum, this passage significantly undermines the defendants' contention that *Timken* "forbids" the collection of

cash deposits (or any other action beyond suspension of liquidation) prior to a conclusive court decision.[4]

The ITC also points to *Hosiden Corp. v. Advanced Display Manufacturers of America*, 85 F.3d 589 (Fed. Cir. 1996) as support for its position; the defendant-intervenors echo this assertion with force, asserting that the *Hosiden* Court "ruled explicitly on the issue of cash deposits and found that a change in cash deposits is not required as a result of a decision of this Court that is not yet 'conclusive.'" Def.-Int's No. 09-00110 Resp. at 18.

The court is unable to agree that *Hosiden* stands for the proposition the defendants advocate. This Court has never interpreted *Hosiden* to be more than a reaffirmation of the proposition that, regardless of the circumstances, this Court may not order liquidation of any of the affected merchandise prior to a final and conclusive court decision. It is worth noting that the CIT action on appeal in *Hosiden* was a writ of mandamus that contained five separate decretal paragraphs, and that the majority of these paragraphs contained more than one specific order. Hence, the Court's directive ordering Commerce to modify cash deposits and revoke the existing antidumping duty order, and the Court's directive ordering Commerce to revoke the suspension of liquidation and return previously collected cash deposits, were only two orders among many; however, only the latter order was discussed in the opinion. *See Hosiden Corp. v. United States*, 861

---

[4] It also appears that the Federal Circuit has indicated an *assumption* that antidumping duty orders are modified pursuant to judgments of this Court regardless of whether an appeal has been filed. *See Atlantic Sugar Ltd., v. United States*, 744 F.2d 556, 564 (Fed. Cir. 1984) (reversing this Court's finding of insubstantial evidence, reinstating the original ITC determination, and ordering reinstatement of the antidumping duty order— indicating an assumption that the antidumping order had been revoked pursuant to the CIT decision).

F. Supp. 115, 120-21 (1994). While it is true that the Federal Circuit subsequently vacated the writ

of mandamus as contrary to law, the sole focus of that rather brief opinion was that section 1516a(e)

and relevant precedent precluded this Court from ordering *liquidation* prior to the issuance of the

final decision on appeal. Specifically, the Court stated:

> Statute and precedent are clear that the decision of the Court of International Trade
> is not a "final court decision" when appeal has been taken to the Federal Circuit. The
> Court of International Trade does not have discretion to require liquidation before the
> final decision on appeal. 19 U.S.C. § 1516a(e) requires that liquidation, once
> enjoined, remains suspended until there is a "conclusive court decision which decides
> the matter, so that subsequent entries can be liquidated in accordance with that
> conclusive decision."

*Hosiden*, 85 F.3d 591 (Fed. Cir. 1996) (quoting *Timken*, 893 F. 2d at 342). Although *Hosiden*

contains the very broad language quoted by the defendants (in the first sentence of the passage

quoted above), the sentence that follows limits the holding to matters regarding liquidation and

section 1516a(e). At best, *Hosiden* might be construed to prohibit the return of previously collected

cash deposits (which may only be returned upon liquidation, *see* 19 U.S.C. § 1505), but defendant-

intervenors assertion that the *Hosiden* Court "ruled explicitly on the issue of cash deposits," is

simply not credible.

### 4. *Chevron Deference and 19 U.S.C. § 1516a*

Before addressing further the ITC's interpretation of section 1516a, the court must

clarify that the ITC's interpretation of that statute is not entitled to *Chevron* deference. The familiar

two-part analysis set forth in *Chevron* guides the court's analysis when determining the lawfulness

of an agency's construction of a statute it administers, and in the first part of the analysis, the court

must look to "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467

U.S. at 842. If the court finds that Congress has clearly spoken to the question at issue, the analysis

is at an end, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.*" Id.* at 843. However, if the court finds the statute to be silent or ambiguous, it reaches the second step of the analysis, where it must determine whether the agency's interpretation is reasonable; the court must defer to that interpretation if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." *Rust v. Sullivan,* 500 U.S. 173, 184 (1991); *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994).

Implicit in the first step of the *Chevron* analysis, however, is a third question, which must be answered in the affirmative before proceeding: Has Congress truly delegated to the agency the task of administering the statute in question? That is, if there is an interpretive "gap" in the statute, is it reasonable to conclude that the "gap" is one that Congress expected the agency to fill? The Supreme Court touched upon the issue in *Smiley v. Citibank (S.D.), N.A,* explaining:

> We accord deference to agencies under *Chevron*, not because of a presumption that they drafted the provisions in question, or were present at the hearings, or spoke to the principal sponsors; but rather because of a presumption that Congress, when it left ambiguity in a statute *meant for implementation by an agency*, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.

*Smiley*, 517 U.S. 735, 740-741 (1996) (italics added).

In brief, the two-step *Chevron* analysis is warranted only when (a) Congress appears to have delegated authority to the agency; and (b) the agency interpretation in question "was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-227 (2001). *See also Gonzales v. Oregon,* 546 U.S. 243, 255-256 (2006); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). The particular statue the ITC would interpret, however, is

unlike the provision accorded interpretive deference in *Chevron* (the definition of "point source")

or *United States v. Haggar Apparel Co.*, 526 U.S. 380 (1999) (interpreting a particular exemption

in HTSUS), and a multitude of other cases. Here, the ITC and the defendant-intervenors contend

that the court should accord deference to the ITC's interpretation of section 1516a of Title 19 of the

United States Code, which the ITC itself describes as governing "[j]udicial review in countervailing

duty and antidumping duty proceedings." In other words, the ITC contends it is entitled to deference

on its interpretation of the very statutes governing aspects of the judicial proceedings to which it is

a party. Such a proposition is patently unreasonable and must be rejected. *See Marbury v. Madison*,

1 U.S. (1 Cranch) 137 (1803). Accordingly, the court affords no deference to the ITC's

interpretation of section 1516a.[5]

### 5. *19 U.S.C. § 1516a(c)(3): Remand for Final Disposition*

In proceedings before this Court, references to section 1516a(c)(3) have been used

almost universally as support for the Court's ability to issue remands. *See*, *e.g.*, *United States Steel*

*Group v. United States*, 24 CIT 1326, 1332, 123 F. Supp. 2d 1365, 1372 (2000); *Nippon Steel Corp.*

*v. United States*, 19 CIT 827 (1995). However, the ITC proposes that section 1516a(c)(3) means

something entirely different. The Commission asserts that, based upon the analysis set forth in

*Timken*, the term "final" used in section 1516a(c)(3) clearly means "final and conclusive." Hence,

says the Commission, section 1516a(c)(3) is, in reality a provision that "instructs that the courts may

*only* remand the matter to the Commission for disposition consistent with the final disposition of the

---

[5]  The court expresses no opinion on whether deference should be accorded to the Commission's interpretation of 19 U.S.C. § 1673.

court" *after* there has been a "*final disposition* of {the} action . . .{that} is not in harmony with the {original} published determination . . . of the Commission." ITC Mem. at 13 (ITC's alterations). In other words, the Commission states that it has no duty to take action "consistent with the final disposition of the court" unless the matter has been remanded pursuant to a final and conclusive decision, which has not yet occurred in this case.

As noted above, the ITC's interpretation of section 1516a(c)(3) is derived, in part, from the *Timken* Court's conclusion that the term "final" in section 1516a(e) referred to a final and conclusive decision. Specifically, where that Court notes:

> Most persuasive is the fact that the term "final court decision" must be read together with the words that follow, specifically, "in the action." An "action" does not end when one court renders a decision, but continues through the appeal process. Thus, an appealed CIT decision is not the *final* court decision *in the action*. In this context, the word "final" is used as it is used in 28 U.S.C. § 2645(c), *i.e.*, to mean "conclusive." Thus, § 1516a(e) does not require liquidation in accordance with an appealed CIT decision, since that section requires that liquidation take place in accordance with the final court decision in the action.

*Timken*, 839 F.2d at 339-40. According to the ITC, the above analysis combines with the "canons of statutory construction" to demonstrate that the term "final" as it is used in section 1516a(c)(3) must likewise refer only to a final and conclusive court decision:

> Congress used the word "final" to describe court action only in these two subsections of section 1516a. The canons of statutory construction instruct that use of an identical term within various provisions of a statute should normally be given the same meaning. By using the term "final" to refer to court action in subsection 19 U.S.C. § 1516a(c)(3) and 19 U.S.C. § 1516a(e), while omitting that modifier in other sections, Congress made clear that these sections were intended to cover only "final" appellate action. . . . As a result, the references in 19 U.S.C. § 1516a(c)(3) to the "final disposition of an action" and "the final disposition of the court" refer to the court decision that finally and conclusively disposes of the action.

ITC Mem. at 21-22, n.21 (citations omitted). Thus, the Commission argues essentially that the *Timken* Court's conclusion as to the meaning of the term "final" in section 1516a(e) must also be applied to that term as it is used in section 1516a(c)(3).[6]

The court finds this analysis flawed in several respects. First, the analysis ignores that it is also a basic canon of statutory construction that the words of a statute "must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809 (1989). The *Timken* court's conclusion that the term "final" as it is used in section 1516(e) means "final and conclusive" was not simply the result of applying a single canon of statutory construction. On the contrary, that conclusion resulted from an observation as to the plain meaning of the text, an analysis as to whether that meaning was consistent with the statutory scheme, and confirmation that the proposed meaning of the term was supported by legislative history and could be harmonized with existing caselaw. *See Timken*, 839 F.2d at 339-40.

Second, the ITC focuses on the term "final" at the expense of ignoring the rest of the statute—particularly the term "remand." Unlike the term "final," the definition of a remand is rarely subject to ambiguity or debate. A remand is a type of court order; it means "[t]o send (a case or

---

[6] Section 1516a(c)(3) provides

**(3) Remand for final disposition.**

If the final disposition of an action brought under this section is not in harmony with the published determination of the Secretary, the administering authority, or the Commission, the matter shall be remanded to the Secretary, the administering authority, or the Commission, as appropriate, for disposition consistent with the final disposition of the court.

claim) back to the court or tribunal from which it came for some further action." *Black's Law Dictionary* 1407 (9th ed. 2009). *See Ford Motor Co. v. N.L.R.B.*, 305 U.S. 364, 374 (1939) (noting that a remand "means simply that the case is returned to the administrative body in order that it may take further action in accordance with the applicable law."). A remand order is generally considered to be "an interlocutory order that does not divest a court of jurisdiction." *Avery v. Secretary of Health and Human Services,* 762 F.2d 158 (1st Cir. 1985).

However, when combined with the ITC's definition of "finality," the ordering of a remand makes no sense. Under the ITC's interpretation, the conclusive finality of a judgment – and the alleged duty to issue a remand—ripens at a point in time when "remand" (as the term is used in American jurisprudence) is no longer possible. That is, once a case has achieved the "conclusive" finality that the ITC asserts is a prerequisite for a 1516a(c)(3) remand, no further action may be taken on that case. Although a court may enforce its judgments, that is not the same as a remand. A court remands a matter for action *on the case,* which cannot occur subsequent to a final and conclusive decision.[7] The ITC's interpretation of section 1516a(c)(3) would require the court, *inter alia*, to expand the definition of a thoroughly-understood term to mean something entirely different. This the court is unwilling to do.

It is perhaps worth noting that the Commission's proposed interpretation attempts to fashion section 1516a(c)(3) in the likeness section 1514(a). Section 1514(a) provides that "[w]hen a judgment or order of the United States Court of International Trade has become final, the papers transmitted shall be returned, together with a copy of the judgment or order to the Customs Service,

---

[7] And does not occur. The court is unable to find any record of any court issuing a 1516a(c)(3) "remand" of the nature proposed by the ITC.

which shall take action accordingly." 19 U.S.C. § 1514(a). In this provision, Congress expressly provided that the U.S. Customs and Border Protection ("CBP")—directly, and without remand—is to effectuate the Court's decision upon receipt of a judgment or order that "has become final." Because a judgment of this Court is final and appealable on the date it is issued, a judgment can only "become final" in the sense that it is no longer subject to appeal or collateral attack, *i.e.*, final and conclusive. *See Heraeus Amersil v. United States*, 10 CIT 438, 638 F. Supp. 342 (1986). Accordingly, the existence of such a clear statutory directive demonstrates that when Congress intended to delay the enforcement of this Court's decisions, it did so explicitly.[8]

In any event, the court is not persuaded that the *Timken* Court's interpretation of "the final court decision in the action" as it is used in section 1516a(e) may be so readily applied to section 1516a(c)(3), because the language of that latter provision is slightly different. The *Timken* Court focused on the phrase "in the action" as persuasive evidence that "the final court decision *in the action*" referred to a final and conclusive court decision, as opposed to the finality that occurs from this Court's entry of judgment. By contrast, section 1516a(c)(3) refers to "the final disposition of *an action brought under this section*," which, arguably, means something entirely different. The phrase "an action brought under this section" (or "this subsection" or "paragraph") is used several times in section 1516a simply to describe which causes of action are governed by the particular provision. Moreover, the Commission overlooks that a "final disposition" is not necessarily the same as a "final court decision." Under CIT Rule 16, a matter is submitted "for final disposition" when the deadline for the submission of pleadings or evidence has passed and the matter is submitted

---

[8] Because section 1514(a) applies only to CBP entry decisions, the only practical result of the section 1514(a) "stay" is to suspend liquidation pending appeal.

to the Court so that it may render a decision. *See* CIT Rule 16(e); *see also* CIT Rules 16(a)(4), 16(e), 16(b)(3)(B)(v), 30(f)(1), 84(h).[9]   Hence, under the Court's Rules (which were adopted in the Customs Courts Act of 1980, shortly after the Trade Agreements Act of 1979), a "final disposition" would include not only judgments that are "final and appealable," but interlocutory decisions as well, such as a remand.

Moreover, as noted above, the vast majority of judicial references to section 1516a(c)(3) do not support the ITC's interpretation.  In one of the few (perhaps only) judicial discussions of that specific provision, the Federal Circuit interpreted section 1516a(c)(3) as curtailing this Court's ability to reverse or modify the agency decision, stating:

> Section 1516a limits the Court of International Trade to affirmances and remand orders;  an outright reversal without a remand does not appear to be contemplated by the statute: "If the [Court of International Trade's] final disposition of an action brought under this section is not in harmony with the published determination [of] the Commission, the matter shall be remanded to . . . the Commission, as

---

[9]  Another potential problem with the ITC's interpretation surrounds its characterization of the section (c)(3) reference to "the published determination" as necessarily or only referring to the agency's original determination.  In fact, the standard canons of statutory construction would seem to indicate otherwise, because the "determination" at issue is referred to as  "the published determination" only in sections (c)(3) and (e), whereas sections (c)(1) and (c)(2) refer to "a determination . . . contested under subsection (a) of this section" and "a determination described in paragraph (2) of subsection (a) of this section."  Unfortunately, the term "published determination" in itself is problematic, because not all of the "determinations" reviewable under 1516a are published.  As shown in sections 1516a(a)(1) and (a)(2)(A), final determinations such as the one at issue here require only "publication of notice" of the decision.  At the risk, perhaps, of certain impropriety in this assumption, this designation is probably an oversight: historically speaking, most of what is now section 1516a was previously found in section 1516.  *See* 19 U.S.C. § 1516(g) (1977).  Section 1516 required (and still does require) publication of the decision as a part of the protest procedure at the administrative level.  Moreover, previous versions of the bill that eventually became the Tariff Agreements Act of 1979 required publication of the actual decision.  It is therefore more reasonable to conclude that "published decision" in section (c)(3) refers to the original agency decision.

> appropriate, for disposition consistent with the final disposition of the [Court of International Trade]."

*Altx v. United States*, 370 F.3d at 1108, 1111 n.2 (Fed. Cir. 2004) (quoting 1516a(c)(3)) (alterations in original).[10]  By contrast, the ITC's interpretation implies that the Court is not so restricted.  Case law suggests that, prior to the enactment of the Trade Agreements Act of 1979, the powers of the Court were viewed in a manner that might charitably be described as the exact opposite of how they are viewed today.  During that time, this Court's predecessor voided the agency decision and ordered liquidation in accordance with its own opinion, eschewing remands in all but the most unusual circumstances.  *See*, *e.g.*, *AS Industries, Inc. v. United States*, 82 Cust. Ct. 101, 149-52, 467 F. Supp. 1200, 1239-41 (1979).

Finally, the court cannot agree with the ITC's assertion that its interpretation is supported by legislative history.  The "support" to which the Commission refers is a single comment found in the Senate Finance Committee Report on H.R. 4537 (signed into law as the Trade Agreements Act of 1979).  That comment describes the new section 1516a(c)(3) as providing "that if the final disposition of an action instituted under the section is not in harmony with the challenged decision, the matter shall be remanded to the decision-maker for disposition consistent with the court's decision." *S. Rep*. No. 96-249, 96th Cong., 1st Sess. at 249.  The court finds this statement profoundly unilluminating as to the issue here; this comment simply repeats the language of the

---

[10]   The Court's authority to remand matters to the appropriate agency appears to stretch beyond the "if-then" mandate of section 1516a(c)(3), *see* 28 U.S.C. § 2643(c)(1) and *Borlem S.a.-empreedimentos Industriais v. United States*, 913 F.2d 933 (Fed. Cir. 1990) (holding that Court had power to remand ITC decision for reconsideration where Commerce remand decision may have an effect on the ITC's material injury finding).

statute with no indication of a deliberate effort to interpret it.  However, three pages later the same

Senate Report contains the following statement:

> It is . . . unclear under the current law whether the Customs Court can
> or should remand a matter to an administrative agency when it holds
> that the agency's decision is erroneous.  Section [1516a] will make it
> clear that the court has the power to remand the matter to the agency.

*Id*. at 252. This statement is clearly inconsistent with the interpretation advocated by the ITC, and,

unlike the previous comment,  it reflects a deliberate effort to interpret the provision.  In *toto*, the

Senate Report comments are, at best, in equipoise; though more accurately, the Senate Report

appears to contravene the ITC's position.[11]

---

[11]  The court is likewise unable to find support for the ITC's interpretation anywhere in the legislative history associated with the Act at issue, Public Law 96-39, 93 Stat 144 (1979) or the previous versions thereof.  On the other hand, there seems to be ample support for the view that the provision referred to remands issued by this Court.  Every previous version of the eventually-codified bill contained a provision similar to section 1516a(c)(3) that clearly referred to remands issued by this Court.  *See* Title VI of S. 2857, § 516(g)(2) *Congressional Record* – Senate (Apr. 7, 1978) at 9196 (providing that "upon the filing of an action for judicial review under subsection (1) of this subsection, the Customs Court shall review the record of the decision of the Secretary or the United States International Trade Commission . . . [t]he Court may affirm the decision or order that the entire matter be returned for further consideration, but the Court may not modify the decision"); Title I of S. 223 (providing  that "if the court determines in favor of the petitioning party as to actions commenced under paragraph (3) or (4) of this subsection, it shall remand the matter to the Secretary or the Commission, whichever is appropriate, for action, not inconsistent with the court's determination"); *Congressional Record* – Senate (Jan. 25, 1979) at 1143 ("[r]eview is not expanded to the extent that reversing an[] administrative determination would be so easy as to maintain a considerable degree of uncertainty in the marketplace following the completion of agency action[; r]ather, the greater review ability should induce the administrative agencies to be more careful in applying the law consistently to the facts, and induce greater disclosure of the issues decided and the reasons for those decisions").  Hence, although some legislative history is ambiguous, most would appear to be in contravention of the ITC's position.

6. *Consequences of An Affirmative Determination*

Commerce takes the position that because it has not received "formal" notice of an

affirmative ITC decision issued under section 1673d(b), it therefore cannot lawfully issue

antidumping duty orders or collect cash deposits. *See*, *e.g.*, DOC Mem. at 9-10. More specifically,

Commerce argues:

> Although the January 22 letter briefly recounts the history of <u>DSMC Slip Op. 09-5</u>,
> and includes a copy of the administrative remand determination, the letter does not
> provide notice "of an affirmative determination under section 1673d(b)." The sole
> purpose of the January 22, 2009 letter was "to inform [Commerce] of the final
> decision of the U.S. Court of International Trade . . . regarding the Commission's
> [original negative injury] determinations." The letter explains that the ITC made an
> affirmative determination upon remand, and that this Court's opinion in DSMC Slip
> Op. 09-5 affirming that remand constitutes a decision not in harmony. . . . Nowhere
> in the letter does the ITC state that the remand determination constitutes a section
> 1673d(b) "final determination" of affirmative injury, as required by section 1673e(a)
> before Commerce may publish an order.

DOC Mem. at 10 (citations omitted) (DOC's alterations).

Under Commerce's logic, the ITC's Remand Determination was reached *only*

pursuant to 19 U.S.C. § 1516a. A remand determination is not so insulated. The third branch of

government does not "take over" an antidumping matter from the executive branch; the role of the

Court is statutorily confined to deciding whether or not there is substantial evidence on the record

to support the executive determination reached. Further, section 1516a(c)(3) provides that "[i]f the

final disposition of an action brought under this section is not in harmony with the published

determination of the Secretary, the administering authority, or the Commission, *the matter* shall be

remanded to the Secretary, the administering authority, or the Commission, as appropriate, for

disposition consistent with the final disposition of the court." The *matter* in this instance was, of

course, the ITC's final negative determination that it made pursuant to 19 U.S.C. § 1673d, *see* 19 U.S.C. § 1516a(2)(B)(ii), which this court found "unlawful" in accordance with 1516a(b)(1)(B)(i).

The ITC does not comment directly on the legal implications of its notice to the Department. Instead, it argues that section 1673 publication does not apply to determinations that result from judicial review. The ITC contends that separate statutory provisions govern the publication of agency determinations "depending on whether the determinations were issued during an antidumping investigation or a court action" (ITC Mem. at 9), a contention that is apparently based only on an observation of the overall statutory scheme. More specifically, the ITC reasons that because the provisions contained in section 1673d govern procedure undertaken "within the specific time frames during an investigation specified in sections 1673d(b)(2) & (3), it is clear that the publication requirement in section 1673d(d) is . . . directly applicable only to final determinations issued by the Commission during the course of an injury investigation." *Id*. at 10. Conversely, says the ITC, section 1516a governs publication during judicial review and section 1516a(e) supports the Commission's practice of not publishing notice of a remand determination until a final and conclusive decision in the matter. *Id.* at 17.

The main problem with the ITC's argument, of course, is that nowhere in the text of section 1673d(d) or the related subsections is there any indication that those provisions do not apply to determinations issued pursuant to a court-ordered remand. Further, even if the court were to accept such a premise, ITC's interpretation is not entirely consistent with its own argument. That is, because a final and conclusive decision is, by definition, still a product of judicial review, it would still not constitute the section 1673d(b) determination that Commerce argues is strictly required, and, seemingly, would not trigger the section 1673d(d) notice-publication requirement.

7. *Legal Replacement of the Original Determination*

In *Decca Hospitality Furnishings, LLC v. United States*, the court observed that "Commerce's own remand determination, as a matter of law, replaces Commerce's original, final determination." 30 CIT 357, 363, 427 F. Supp. 2d 1249, 1255 n.11 (2006). The defendants roundly attack that proposition as "unsupported," but, ironically, provide no support to the contrary. Whatever the reasons for this lack of support, the court is compelled to agree with *Decca*.

That a remand determination replaces the original determination is a notion so basic to administrative law that few courts have found the need to articulate it expressly. If the remand determination did not legally replace the original determination (which the court has, by definition deemed unlawful or inadequate), orders of remand would be pointless; the court would have no reason (and likely no jurisdiction) to review remand determinations. Furthermore, because a judicial holding that an agency decision is unlawful essentially constitutes a *vacatur* of that decision, a new determination is logically necessary to fill the void. *See* 5 U.S.C. § 706(2) (providing that the reviewing court shall "hold unlawful and set aside" agency actions unsupported by substantial evidence); *Timken U.S. Corp. v. United States,* 421 F.3d 1350, 1355 (Fed. Cir. 2005) (holding that an agency's "failure to provide the necessary clarity for judicial review requires that the action be vacated") (quoting *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973); *Sugar Cane Growers Co-op of Fla. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002) (stating that "[n]ormally, when an agency so clearly violates the APA we would vacate its action . . . and simply remand for the agency to start again.").

Even without *vacatur*, the entire purpose of a remand is to allow the lower tribunal to rectify or replace a decision that a court has found to be deficient.[12]

Although the practical effect of the Federal Circuit's decision in *Melamine Chemicals* essentially operates to stay the legal effects of the *vacatur* until the Court's issuance of judgment (which may only occur when the court sustains a (remand) determination), that fact is irrelevant here because the court has rendered the requisite final decision and issued the judgment necessary to give *that* decision legal effect. *Tembec, Inc. v. United States*, 31 CIT __, 475 F. Supp. 2d 1393, n.2 (2007) (noting that "judgment is the legal pronouncement of [the] decision and the act that gives the decision legal effect."). Accordingly, the contention that the original vacated or unlawful determination continues to "govern" after issuance of judgment is simply a legal impossibility. *Cf. Co-Steel Raritan, Inc. v. International Trade Commission*, 357 F. 3d 1294,1319 (Fed. Cir. 2004) (dissent) (observing that "[i]ndeed, once the Commission issued its remand determination, the negative preliminary determination ceased to exist and the current posture of the case was that the Commission had issued an affirmative preliminary determination, with continuing administrative proceedings to come").

The process of judicial review reveals no distinction between original determinations and remand determinations and lends no support to the inference that remand determinations do not have the same legal status as the original determination. The court's review of agency determinations issued pursuant to a court-ordered remand is governed by the same standard of

---

[12] *See* Daniel B. Rodriguez, *Of Gift Horses and Great Expectations: Remands Without Vacatur in Administrative Law*, 36 Ariz. St. L.J. 599, 612-17 (2004) (noting that ordering remand without *vacatur* allows the challenged agency action to stand during remand proceedings).

review used in reviewing the original determination. The statutory "presumption of correctness" afforded to agency decisions contains no distinction between determinations issued within the context of an original investigation and those issued as a result of a remand from this court. *See* 28 U.S.C. §§ 2639(a)(1), 2640.

Likewise, the Federal Circuit's review of CIT decisions does not turn on whether the agency determination being reviewed was the original determination or a determination issued on remand. *See Altx*, 370 F.3d 1108, 1117 (Fed. Cir. 2004) (holding that appellate review "encompasses the entirety of the proceedings before the Court of International Trade, including intermediate remand orders that would not, independently be appealable" although court remand orders are generally reviewed under the more lax "abuse of discretion" standard). Moreover, reversals of this Court's decisions frequently necessitate orders to "reinstate" the original determination or a previous remand determination. *See Nippon Steel Corp. v. United States Intern. Trade Comm'n*, 494 F.3d 1371 (Fed. Cir. 2007); *Viraj Group v. United States*, 476 F.3d 1349, 1359 (Fed. Cir. 2007); *Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006); *Tak Fat Trading Co. v. United States,* 396 F.3d 1378, 1386 (Fed. Cir. 2005).

While the court can agree that requiring immediate publication of every remand determination would present grave logistical complications (not least because it is not unusual to find cases resulting in two, three, or even four remand determinations), the court need not determine the precise legal posture of a remand determination as it exists on the date of issuance, because the Federal Circuit's holding in *Timken*, as well as the text of section 1516a(c)(1), establish that *except* for liquidation, which is governed by section 1516a(e), a remand determination becomes legally operative on the date that this Court issues a final decision sustaining it. Hence, if an agency's

refusal to publish notice of such a determination alters that scheme (such as the potential delay under

section 1673e discussed below) the withholding of publication would be contrary to law.  However,

in this case the ITC need not publish notice of its affirmative determination because, consistent with

*Timken* and the ITC's own arguments, publication of notice of the court's decision also serves to

give notice of the affirmative remand determination that it sustained.  Simply stated, in the context

of judicial review, Commerce's publication of the *Timken Notice* under section 1516a(c)(1)

effectively stands in the place of 1673d(d) notice publication.  Such a conclusion flows logically

from the *Timken* holding and reflects the related doctrine that court decisions adjudicating the

lawfulness of lower-tribunal determinations essentially replace (or encompass) the determination(s)

on review.  *See Disabled American Veterans v. Gober*, 234 F.3d 682, 693 (Fed. Cir. 2000) (holding

that "[i]f a superior court, such as the Court of Appeals for Veterans Claims, affirms the

determination of the Board on a particular issue, that Board decision is replaced by the Court of

Appeals for Veterans Claims decision on that issue."); *Zhejiang Native Produce & Animal By-*

*Products Imp. & Exp. Group Corp. v. United States*, No. 2008-1106, 2009 U.S. App. LEXIS 16179

(Fed. Cir. July 23, 2009) (unpublished) (holding that "[a]lthough the trial court's 2004 judgment was

final, that final judgment was reversed on appeal and remanded to the trial court[; t]here is thus no

longer any final judgment in this case as to which a Rule 60(b) motion could properly be filed").

Accordingly, because the ITC's affirmative determination has been published, DSMC's request for

a writ of mandamus as it applies to the ITC will be denied as moot.

### 8. *Presumption of Correctness*

Finally, the defendant-intervenors contend, *inter alia* and nonetheless, that the

question of the legal effectiveness of CIT decisions on appeal was resolved when the *Timken* Court

"stated that an agency's determination is 'presumed correct' and that, if the Court or Federal Circuit renders a decision which is contrary to that determination, the presumption of correctness disappears . . . until there is a *conclusive* court decision which decides the matter." Def.-Int's No. 09-00110 Resp. at 10.[13] The arguments in this regard are, in the very least, misguided. The presumption of correctness has no bearing on this matter. Several cases issued subsequent to *Timken* established that the presumption of correctness is "a procedural device" that allocates the burdens of proof/production between the two litigating parties, and "is analytically distinct from the deference afforded to [an agency] decision, which is instead governed by standards of review." *Universal Elecs. v. United States*, 112 F.3d 488, 493 (Fed. Cir. 1997); *Anhydrides & Chemicals, Inc., v. United States,* 130 F.3d 1481, 1486 (Fed. Cir. 1997) (holding that "when there is no factual dispute the presumption of correctness under § 2639(a)(1) is irrelevant"); *Goodman Mfg., L.P. v. United States,* 69 F.3d 505, 508 (Fed. Cir. 1995) (finding that "[b]ecause there was no factual dispute between the parties, the presumption of correctness is not relevant").

### B.  DSMC Lacks Adequate Means to Obtain the Desired Relief

The defendants argue that the current suspension of liquidation is an adequate alternative remedy to the relief DSMC is seeking because suspension of liquidation preserves DSMC's rights if Slip Op. 09-5 is affirmed on appeal. DOC Mem. at 17-18; ITC Mem. at 26. In this regard, the ITC points out that Commerce suspended liquidation on imports of subject

---

[13] Counsel for the defendant-intervenors must be cautioned that a more scrupulous attention to detail may be warranted when quoting language from Court decisions. Omission of language within quotations that results in a substantive change may be seen as a deliberate attempt to mislead the court. *See Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346 (2003).

merchandise entered after January 23, 2009, and that, less certainly, "all appropriate antidumping duties will be collected fully and accurately, on these entries of subject merchandise" if the decision is affirmed on appeal. ITC Mem. at 26.

The court finds these arguments inadequate. First, Commerce and the Commission fail to address whether section 1673e(b)(2) may effectively deprive the plaintiff of relief. That section provides:

**(b) Imposition of duty**.

* * *

(2) Special rule. If the Commission, in its final determination under [19 U.S.C. § 1673d(b)], finds threat of material injury, other than threat of material injury described in paragraph (1), or material retardation of the establishment of an industry in the United States, then subject merchandise which is entered, or withdrawn from warehouse, for consumption *on or after the date of publication of notice of an affirmative determination of the Commission under* [19 U.S.C. § 1673d(b)] shall be subject to the assessment of antidumping duties under section [19 U.S.C. § 1673], and the administering authority shall release any bond or other security, and refund any cash deposit made, to secure the payment of antidumping duties with respect to entries of the merchandise entered, or withdrawn from warehouse, for consumption before that date.

19 U.S.C. § 1673e(b)(2) (emphasis added).

The plain meaning of this provision implies that where the Commission's final determination is affirmative for *threat of material injury only*, any delay in publication of the affirmative decision literally pushes forward the date that duties will be assessed: duties will be assessed *only* on subject merchandise entered "on or after the date of publication of notice of an affirmative determination of the Commission . . . ." 19 U.S.C. § 1673e(b)(2). And, in accordance with the plain meaning of 19 U.S.C. § 1516a(c)(1), once the decision becomes final and conclusive,

the suspension of liquidation is removed, and all subject merchandise entered *after* the *Timken Notice* (that is required as a consequence of the first "adverse" court decision) is liquidated in accordance with the adverse court decision (or, more accurately, in accordance with the remand determination that the court sustained). This plain timeline is illustrated below as line "A," while the interpretation the ITC effectively contemplates in this matter is demarcated as line "B":



The Commission's interpretation is inaccurate, because section 1516a(c)(1) contemplates that adversity towards the administrative determination is *established* at the point in time when the first "final" adverse judicial decision is issued, which is *not* the same point in time at which such decision becomes "final and conclusive." The Commission's interpretation does not impact the ultimate relief to which a plaintiff is entitled in the "ordinary" instance of a judicial decision adverse to a final negative Commission determination on the issue of *material injury* (because subject merchandise entered *after* the adverse judicial decision— or, more accurately, after publication of notice of that decision, and provided liquidation is enjoined—is to be liquidated in

accordance with such adverse judicial decision and not in accordance with the agency's original negative determination), but plainly that is not so in the instance of an adverse judicial decision on a final negative Commission determination on *threat* of material injury. If the Commission delays "notice of publication" until all appeals have been exhausted, then the plain operation of section 1673e(b)(2), in the context of section 1516a(c)(1), necessarily results in the elimination of a substantial portion of the relief to which the plaintiff is legally entitled. As observed above, that interpretation is not in accordance with *Timken*, and it is difficult to comprehend the government's assertion that DSMC's rights are "preserved" by the suspension of liquidation: even if the Court of Appeals for the Federal Circuit were to affirm this court's decision, section 1673e(b)(2) would prevent the retroactive assessment of duties upon entries of subject merchandise until "notice of publication" (in accordance with the Commission's interpretation) and *regardless* of the "suspension of liquidation" existent to such point in time.

Second, even without the operation of section 1673e(b)(2), the court cannot agree that the future collection of cash deposits (or, as the case may be, the collection of retroactive duties, with interest) provides the same benefit to the plaintiff as would immediate issuance of an order and the collection of cash deposits.[14] The antidumping laws were intended to protect United States industries against the domestic sale of foreign manufactured goods at prices below the fair market value of those goods in the foreign country, *Aimcor v. United States,* 141 F.3d 1098, 1101 (Fed. Cir. 1998), and Congress has long recognized that, unlike traditional customs cases, antidumping and countervailing duty cases demand expeditious resolution. *See* S. Rep. No. 96-249, 96th Cong., 1st

---

[14] Indeed, there would be no contest here today if the parties all agreed that future payments and current cash deposits were essentially the same.

Sess. 37 (1979). That is, in traditional customs-valuation cases, the only consequences of the Court's decision was "whether an overpayment of duty would eventually be refunded, [and] the enforceability of the lower court's judgment was normally not a pressing matter." *American Grape Growers Alliance for Free Trade v. United States*, 9 CIT 568, 569, 622 F. Supp. 295, 297 (1985). In this case however, the Commission's affirmative determination, albeit on remand, constitutes a finding that the domestic industry is *imminently* threatened with material injury by reason of dumped subject imports. 19 U.S.C. §1677(7)(F)(ii). Accordingly, the defendants' assertion that the postponement of the relief to which the plaintiff is entitled and that is designed to alleviate or prevent such injury (postponed, as it were, by the defendant-intervenors appeal) is adequately compensated, they claim, by the "fact" that interest will accrue on the duties when they are finally collected is not credible.

### C. The Writ is Appropriate Under the Circumstances

Commerce asserts that the court should deny relief in the nature of a writ of mandamus "because suspension of liquidation preserves the *status quo* and parties' substantive rights to the eventual outcome . . . ." DOC Mem. at 21. What Commerce means by the term "the *status quo*" is, in reality, the condition of having the original determination govern imports of subject merchandise entered subsequent to the issuance of a court decision "not in harmony" with the original determination. Not only is this contention inconsistent with section 1516a(c)(1), as discussed above, it is inconsistent with "the basic proposition that all orders and judgments of courts must be complied with promptly." *Manness*, 419 U.S. at 458. This court's entry of judgment changed the legal relationship of the parties. If a litigant wishes to stay the effect of the court's judgment, it may motion requesting a stay under Rule 62 of the Court's Rules, "but, absent a stay,

[a litigant] must comply promptly with the order pending appeal . . . [p]ersons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect." *Id*. A judgment of this Court that is adverse to an agency determination has the immediate effect of altering the administrative *status quo* and changes the legal relationship between the litigants, and Congress considered that suspending liquidation pending the final conclusive judicial decision was the means by which parties would be protected. Accordingly, the court finds issuance of the writ appropriate under the circumstances of this case. The court has not only the power "but also a duty to enforce [its] prior mandate to prevent evasion," *Iowa Utilities Bd. v. F.C.C.*, 135 F.3d 535, 541 (8th Cir. 1998), *vacated on other grounds*, 525 U.S. 1133 (1999),[15] and failure to enforce judgments would "reward bureaucratic misconduct and encourage [administrative] anarchy." *Id*. *See*, *e.g.*, *United States v. Hanover Ins. Co.*, 82 F.3d 1052 (Fed. Cir. 1996) (CIT has "inherent power to determine the effect of its prior judgments").

---

[15] *See AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 1133 (1999).

### IV. *Conclusion*

With respect to Court No. 06-00247, DSMC's requested writ of mandamus to compel the ITC to publish notice of the Remand Determination is hereby denied as moot in light of *de facto* publication of that determination, by implication, in Commerce's *Timken Notice*.

With respect to Court No. 09-00110, the court concludes that DSMC's requested writ of mandamus shall be granted. Therefore, in accordance with this opinion and in accordance with the Notice of January 22, 2009 from the ITC to Commerce, the Department of Commerce and Secretary Gary Locke, together with his successors in office, delegates, officers, agents, servants and employees, will be ordered to issue and publish antidumping duty orders and require the collection of cash deposits on subject merchandise.

**SO ORDERED**.

/s/   R. Kenton Musgrave
R. KENTON MUSGRAVE, Senior Judge

Dated: September 30, 2009
     New York, New York